Submitted February 21, affirmed December 26, 2013, petition for review denied April 17, 2014 (355 Or 317)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## HUGO RAMIREZ-ESTRADA,
*Defendant-Appellant.*

Washington County Circuit Court
C092770CR; A147049

317 P3d 322

Peter Gartlan, Chief Defender, and Jedediah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and De Muniz, Senior Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction for second-degree unlawful sexual penetration, ORS 163.408, and first-degree sexual abuse, ORS 163.427. He assigns error to the trial court's admission of a nurse practitioner's testimony that she found the child complainant "highly concerning for sexual abuse based on what [the child] had previously said * * * [a]nd what [the child] told [her]," where there was no confirming physical evidence of sexual abuse. Defendant acknowledges that defense counsel did not move to strike the "highly concerning for sexual abuse" testimony after the witness offered it during defense counsel's cross-examination of her, but now argues that the trial court's failure to strike that testimony *sua sponte* represents an "error of law apparent on the record," ORAP 5.45(1),[1] in light of *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), and *State v. Lupoli*, 348 Or 346, 234 P3d 117 (2010). Although we agree that the nurse's testimony would have been inadmissible, we conclude that the trial court's failure to strike it is not plain error because it is plausible that counsel, aware of both *Southard* and *Lupoli* but nevertheless directing questions and argument at the nurse practitioner's ability to evaluate the child's credibility, made a strategic decision not to move to strike the testimony. Accordingly, we affirm.[2]

The child, M, lived with her mother, her two brothers, and defendant, who had been romantically involved with M's mother since M was about five years old. On August 20, 2009, when M was 12 years old, defendant got into M's bed and pulled down M's pajama pants and underwear. Defendant touched her vagina, put his finger inside her vagina, and touched her breasts and bottom.

On December 11, 2009, M told her middle school counselor about an incident earlier that summer where

---

[1] ORAP 5.45(1) provides, in part:

"No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court * * *, provided that the appellate court may consider an error of law apparent on the record."

[2] We reject without published discussion defendant's contention that the trial court plainly erred by instructing the jury that it could convict defendant without reaching unanimity and by accepting and entering convictions based on nonunanimous verdicts.

defendant had inappropriately touched her chest and vagina. When a detective spoke with M later that day, M told her about the August 20, 2009, incident. M also told the detective about another encounter where defendant had touched her breast and three other encounters where defendant had touched her breast and her vagina. The officers discussed those claims with defendant, and he denied sexually abusing M. Later that day, however, defendant told police that one time he had touched M by accident and that he had an erection at that time. Defendant was arrested.

On December 21, 2009, M was evaluated by Daly, a nurse practitioner for CARES Northwest, a regional center that conducts child abuse assessments. Daly found no physical evidence of sexual abuse but, during the physical examination, M told Daly that M's "stepfather" had touched her in her vaginal area. Although Daly normally would have engaged in a "lengthy video taped forensic interview" as part of the CARES evaluation, M told Daly that she did not want to talk further about what had happened to her. About a month after Daly evaluated M, in January 2010, M told two police officers that she had previously lied about what defendant had done to her.

Defendant was charged with four counts of second-degree unlawful sexual penetration and 10 counts of first-degree sexual abuse. At trial, the state offered Daly as "an expert in child sexual abuse." On direct examination, Daly did not reveal any diagnosis or any recommendations she made for M, and the prosecutor specifically stated that he was not asking for a diagnosis. Daly did testify, however, that she "did not diagnose sexual abuse" because she did not get "additional detail" from the formal interview.

Defense counsel pursued that lack of detail on cross-examination. Daly admitted that, as summarized in the CARES evaluation she prepared, M reported to the Department of Human Services (DHS) that defendant "did this only one time," but "the police report [was] different than what [Daly] received in the DHS report." Defense counsel sought to emphasize that, given the lack of a formal interview, Daly's evaluation was based largely on the police and DHS reports:

"Q. So you try and make them feel comfortable? Right?

"A. Well, * * * I do an examination with them, and generally they've been there since 8:30, and * * * the interview doesn't usually start until 10:30, so I offer them something to eat at that point.

"Q. Okay, in this case as you testified, [M] did not want to participate in that next portion of the evaluation, did she?

"A. She didn't want to talk about it at all.

"Q. Did you make any attempt to encourage her to talk about it?

"A. I asked her * * * as I said she was whispering, hunched up and appeared terrified, and as I stated previously she had provided significant detail about this previously. So, when she said no, I did not try to push her.

"Q. So, for the purpose of this [CARES] evaluation you relied on almost complete[ly] the DHS report and the police report?

"A. If you note *I said this was highly concerning for sexual abuse based on what she had previously said.*

"Q. And you base—

"A. *And what she told me.*

"Q. Right, and again we're not going to talk about any diagnosis as you—

"A. Right."

(Emphases added.) Defense counsel offered no objection to the testimony highlighted above, nor did counsel move to strike that testimony or seek a curative instruction.

Ultimately, the jury found defendant guilty on three counts of second-degree unlawful penetration and eight counts of first-degree sexual abuse. Defendant now appeals.

Before we address the parties' arguments on appeal, we must clarify defendant's description of the legal error supporting his claim of plain error. Under *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990), an error is plain if (1) the error is one of law; (2) the error is "not reasonably in dispute";

and (3) the error appears on the record, meaning that "[w]e need not go outside the record or choose between competing inferences to find it[.]" On appeal, defendant vaguely asserts that the "admission of the diagnosis" was error and that "the trial court should have excluded [the testimony]." In this case, however, the trial court did nothing to admit the challenged portion of Daly's testimony; because no objection was made, the trial court did not make a ruling on the admissibility of that testimony. If there was error, then, it was necessarily based on the trial court's inaction—*i.e.*, the trial court's failure to strike the testimony *sua sponte* when Daly offered it on cross-examination. *See State v. Milbradt*, 305 Or 621, 629-30, 756 P2d 620 (1988) (suggesting that a trial court, "*sua sponte*, should summarily cut off the inquiry before a jury is contaminated" by impermissible testimony about the credibility of another witness); *B. A. v. Webb*, 253 Or App 1, 12, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) (explaining that, under *Milbradt*, "trial courts are obligated, *sua sponte*, to exclude and, if necessary, strike testimony that comments on a witness's credibility").

So understood, we turn to the parties' arguments on appeal. Initially, the parties disagree about whether the testimony offered by Daly is clearly prohibited by *Southard* and *Lupoli*. According to defendant, under the Supreme Court's decisions in *Southard* and *Lupoli*, it is beyond dispute that Daly's testimony that M was "highly concerning for sexual abuse" was inadmissible in the absence of confirming physical evidence. The state responds that the claimed legal error here is "reasonably in dispute" under those cases because Daly "did not clearly communicate either that [highly concerning for sexual abuse] constituted a *diagnosis* or that it was based on an assessment of the victim's credibility." (Emphasis in original.)

In *Southard*, the Supreme Court considered "whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse." 347 Or at 142. As relevant here, the court determined that a diagnosis of sexual abuse in the absence of physical evidence was inadmissible under OEC 403 because

the probative value of that evidence was substantially outweighed by the danger of unfair prejudice. The probative value was slight, the court reasoned, because a diagnosis of sexual abuse based solely on an evaluation of the child's credibility "did not tell the jury anything that it was not equally capable of determining on its own." *Id.* at 140. The court found that the risk of prejudice was great:

> "The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence. \*\*\* [T]he diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible."

*Id.* at 140-41 (citation and internal quotation marks omitted). Ultimately, the court concluded that "the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have." *Id.* at 142.

In *Lupoli*, the court reaffirmed the long-held principle "that one witness may not give *an opinion* on whether he or she believes another witness is telling the truth." *Lupoli*, 348 Or at 357 (citing *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983)) (emphasis added). Specifically, the court reasoned that, where there is no physical evidence of abuse, a sexual abuse diagnosis is inadmissible because that diagnosis is "necessarily \*\*\* based on [an] assessment of the child's believability." *Id.* at 362. Thus, in *Lupoli*, the court concluded that it was error to admit experts' statements explaining their sexual abuse diagnoses (generally, that "the children in question displayed the characteristics of truthful children and lacked characteristics indicative of suggestion, influence, or fantasy") where those statements could not be meaningfully separated from the experts' "credibility-based opinion[s]." *Id.* at 349, 362.

We agree with defendant that, under *Southard* and *Lupoli*, it is beyond reasonable dispute that Daly's testimony

was inadmissible. Under *Southard*, the governing question is whether the prejudicial effect of the witness's opinion testimony substantially outweighs its probative value. Daly's assessment of "highly concerning for sexual abuse," like the diagnosis in *Southard*, was of little probative value without confirming physical evidence of abuse; Daly did not tell the jury anything that it could not determine on its own. And, as in *Southard*, here there was a significant risk of prejudice because, given Daly's expressed view, the jury might have "defer[red] to the expert's implicit conclusion that the victim's reports of abuse [were] credible." 347 Or at 141; *see State v. Merrimon*, 234 Or App 515, 521, 228 P3d 666 (2010) (explaining that a diagnosis of highly concerning for sexual abuse "carries with it the expert's implicit conclusion that the [alleged] victim's reports of abuse are credible," even if "that implicit conclusion is, perhaps, not as pronounced as when an expert makes a definitive diagnosis of abuse" (citation and internal quotation marks omitted)).

The state argues, however, that the prejudicial effect of Daly's testimony was minimal because the jurors in this case would not have understood that testimony to have the same "hallmarks of the scientific method" that were present in *Southard*, where Daly did not explain that "highly concerning for sexual abuse" was a diagnosis. We disagree. Daly was presented as "an expert in child sexual abuse," she explained the various components of her evaluation to the jury, and she ultimately expressed her opinion that, given M's statements, M was "highly concerning for sexual abuse." Although Daly did not explain that her opinion was a "diagnosis," as the expert witness did in *Southard*, Daly's testimony "clearly [fell] within *Southard*'s prohibition." *State v. Volynets-Vasylchenko*, 246 Or App 632, 638-39, 267 P3d 206 (2011) (rejecting the state's argument that expert's treatment recommendations were "not a diagnosis of sexual abuse" because "[n]o juror could take [one of the recommendations] as anything other than a statement that [the child] ha[d] been the victim of abuse" and that recommendation colored the others).

Moreover, apart from *Southard*, it is beyond reasonable dispute that Daly's testimony constituted impermissible

vouching under *Lupoli*. Because Daly found no evidence of physical abuse, her statement "necessarily was based on her assessment of the child's believability." *Lupoli*, 348 Or at 362. In fact, Daly made her reliance on M's statements explicit; she testified that the child was "highly concerning for sexual abuse" *based on what the child had said* to Daly during the physical examination (and earlier to the police and DHS officials). Daly's "credibility-based opinion," *id.*, was therefore inadmissible under *Lupoli*.

Having determined that Daly's testimony was prohibited under *Southard* and *Lupoli*, we must determine whether the trial court plainly erred in failing to strike that testimony *sua sponte*. The state argues that "the trial court had no obligation to draw attention to the testimony by attempting to 'cure' it on defendant's behalf" because it is plausible that defense counsel made a strategic decision not to move to strike Daly's testimony or seek a curative instruction to avoid "highlight[ing] the fact that 'highly concerning' was, in fact, a diagnosis and thereby emphasize the significance of what the witness had said." The state emphasizes that the trial occurred after *Southard* and *Lupoli*, both the state and defendant avoided asking about a diagnosis, and "[t]he testimony was elicited by defense counsel's own questioning concerning the basis on which the witness evaluated the victim." Defendant asserts that, "[o]n this record, there is no plausible inference that defendant wanted the diagnosis admitted or made a strategic decision to not object." According to defendant, the fact that the testimony was elicited during cross-examination "does not alter the analysis" because "the nurse's answer not only went beyond [the question asked] but also was not responsive to the question."

We first consider the parties' dispute about whether defense counsel made a strategic decision not to move to strike Daly's testimony or ask for a curative instruction. We have held that a determination that defense counsel made a tactical choice not to object to impermissible testimony must be "plausible" in view of "what actually occurred at trial." *Lovern*, 234 Or App at 512. We therefore have rejected the specific claim that a defendant failed to object because

he "might not have wanted to cause the jury to 'dwell on'" improper vouching testimony where "there [was] nothing in the record indicating that [the] defendant made any kind of strategic choice not to object[.]" *State v. Higgins*, 258 Or App 177, 181, 308 P3d 352 (2013). Similarly, we have refused to simply assume that the defendant's counsel "made a tactical decision not to object" to a sexual abuse diagnosis because *Southard* had been decided before the defendant's trial. *State v. Lopez-Cruz*, 256 Or App 32, 37, 299 P3d 569 (2013). The record must reflect a "plausible tactical reason why counsel would have chosen not to object to * * * diagnosis testimony under *Southard*[.]" *Id.* at 37-38. In this case, then, we cannot assume that defendant's counsel made a strategic decision not to move to strike Daly's testimony simply because *Southard* and *Lupoli* were decided before trial; instead, we must determine—based on the record—whether there is a plausible tactical reason why defense counsel forewent a motion to strike.

At trial, defense counsel's theory of the case from the outset was that M's various disclosures were insufficient to allow the jury to meaningfully evaluate M's description of events. For example, during opening statements, defense counsel argued that, because M refused to give a formal interview as part of Daly's CARES evaluation, Daly—and the jury—were denied an opportunity to evaluate "what exactly happened":

> "You know, why isn't there an interview with her? Why don't you have, usually there's a narrative, a child comes and says this is what happened to me, this is what occurred. And she doesn't talk about it. She says, 'I don't want to do it.'
>
> "So [you're] missing that piece. Usually that interview is video taped. * * *
>
> "And that's what—in some pieces that's not so important, but it's very much a piece of child abuse investigation [ to] have a video of the narrative.
>
> "*So, we're all clear if it ever comes to this what exactly happened.*"

(Emphasis added.)

On Daly's direct examination, the state sought to downplay the importance of the formal interview. The state asked Daly if the lack of a formal interview had any effect on her ability to evaluate the child physically:

"Q. Okay, and so did her reluctance to speak about the abuse further in a further interview make *** your review of her body and your review of her privates deficient in some manner?

"A. Well, it would depend on what you're asking me to do, I was able to identify whether she had any physical injuries, and able to identify whether she had any additional medical needs. I was able to make recommendations for her safety, and for her mental health treatment. If *** you are asking me to diagnose—

"Q. Which I'm not, and please don't—

"A. —definitively I would—*I did not diagnose sexual abuse because I did not get the additional detail there.*

"Q. You—so, with regards to what you were called upon to do which was to evaluate her medically?

"A. Right.

"Q. As you said, and to see how she was doing and if she needed any medical or other recommendations to be made, do you feel like your lack of an interview made that piece of what you did deficient?

"A. No it did not."

(Emphasis added.)

On cross-examination, defense counsel focused on Daly's inability to conduct a formal interview to support her evaluation:

"Q. Okay, in this case as you testified, [M] did not want to participate in that next portion of the evaluation, did she?

"A. She didn't want to talk about it at all.

"*****

"Q. So, for the purpose of this [CARES] evaluation you relied on almost complete[ly] the DHS report and the police report?

"A. If you note I said this was highly concerning for sexual abuse based on what she had previously said.

"Q. And you base—

"A. And what she told me.

"Q. Right, and again we're not going to talk about any diagnosis as you—

"A. Right.

"Q. I'm just simply asking you if—for the purpose of your evaluation you relied for the facts primarily on the DHS report, and the police report you said you had in your possession?

"A. Well, she told me—in my exam she did tell me that her stepfather put his finger in her vagina.

"Q. I understand.

"A. And that was for me enough information to make recommendations about her safety and her health, regardless of the additional details."

Defense counsel then went on to specifically connect the lack of a formal interview with Daly's inability to adequately evaluate M's credibility:

"Q. If [M] had given an interview with you, a videoed interview or without a video, and *she had told you something different* than you read in the police report or at DHS *would that have raised some questions in your mind[?]*

"A. You know, it's interesting, because when we're reading the reports, we're often reading paraphrases and we're reading things that can sometimes get changed when they get passed along. *So, I tend to go more on what I hear directly.*

"Q. Uh huh.

"A. So, I can't say for certain. *It would depend on how different it was.*

"Q. Uh huh.

"A. You know, if she told me that it didn't happen it would change. But if some of—it's the core of [what] she was saying was the same.

"Q. Uh huh.

"A. I'm not certain."

(Emphases added.) In closing argument, defense counsel again suggested that the formal interview was an important missed opportunity for M to give a statement to Daly:

"And what does [M] do? Nothing. She doesn't talk about what happened at all. With the exception of this kind of common theme, which is [']I was touched this one time.['] *** And will she do the interview even though she's offered snacks, in this child center in private with this sweet woman. No, no statement."

Counsel ultimately asserted that the lack of a formal interview rendered Daly's evaluation "worthless":

"So, you have no statement, and no physical evidence. So, we would assert, and we hope you agree that the CARES evaluation [is] totally worthless. Totally worthless in this case. It doesn't show one thing or another."

Those specific arguments were part of the defense's broader claim that M's testimony at trial and her various disclosures (to the police, DHS workers, and Daly) were inconsistent—with varying degrees of detail—and that the jury needed more information than it was given to evaluate M's credibility:

"And we're going to ask you to listen to what [M] said, and use what [M] said as your guidepost. Would it have been helpful to have a couple more interviews for everybody? Of course it would have.

"What if you had another interview? What if you had another interview between a recantation and [now, w]here she tells the story that's just like the one that she told the first time[?] Would *** that have helped? Of course it would have. You all want that. Everybody would want that. Everybody would want that who's listening to this case.

"Would that have helped [you] use what [M] said as your guidepost[?]"

In view of defense counsel's cross-examination and arguments to the jury, we conclude that it is plausible that defense counsel chose not to move to strike Daly's statement

that M was "highly concerning for sexual abuse." Both parties were clearly aware of *Southard* and *Lupoli*; they both steered Daly away from discussing her specific diagnosis and recommendations. Defense counsel nevertheless made a conscious choice to argue that a formal interview—which would allow Daly to assess the child's credibility—was an important part of Daly's evaluation; indeed, counsel claimed that Daly's evaluation was "worthless" without that assessment.

It is therefore plausible that, when Daly revealed her credibility-based opinion on cross-examination, counsel chose to downplay that testimony by immediately noting that Daly was not "going to talk about any diagnosis," especially where Daly had already testified that M had not given Daly the necessary information for a diagnosis "of sexual abuse." Further, defense counsel may have determined that it was better not to ask the court to strike the testimony or seek a curative instruction, given that counsel went on to emphasize, through continued questioning on cross-examination, that Daly could not adequately evaluate M's credibility without a formal interview. Defense counsel may have sought to avoid drawing attention to the fact that Daly could and did form an opinion that M was "highly concerning for sexual abuse," or counsel may have not wanted an instruction essentially telling the jury to disregard Daly's assessment of M's credibility. Those strategic calls are plausible in light of the course of action that defense counsel took: Counsel, in control of cross-examination, conveyed to the jury that Daly was "not going to talk about any diagnosis"; continued to question Daly about her ability to evaluate M's credibility without a formal interview; and ultimately argued that Daly's evaluation was "totally worthless."

Having found that it was plausible that defense counsel made a strategic decision to forgo a motion to strike or curative instruction, we cannot fault the trial court for failing to strike Daly's testimony as an inappropriate diagnosis and credibility assessment without prompting from defense counsel. This case is markedly and materially different from those cases where we have held that the trial court has a *sua sponte* obligation to strike objectionable testimony.

Starting with *Milbradt,* where defense counsel had objected to the prosecutor's elicitation of vouching testimony from a psychotherapist, the Supreme Court "suggest[ed] in the future that if counsel attempts to elicit similar testimony the trial judge, *sua sponte,* should summarily cut off the inquiry before a jury is contaminated by it." 305 Or at 630. Thereafter, in *State v. McQuisten,* 97 Or App 517, 776 P2d 1304 (1989), a case where the trial court had denied the defendant's motion to strike statements made by an officer that the complaining witness was telling the truth, we similarly reasoned that "the trial court had a duty, *sua sponte,* not to allow testimony which commented on a witness'[s] credibility." *Id.* at 520 (citing *Milbradt,* 305 Or at 629-30).

We have reiterated that the trial court has a *sua sponte* obligation to intervene by striking testimony or giving an instruction in a number of cases where the state elicited the improper testimony or the witness volunteered it on the state's examination, where nothing in the record showed that it was plausible that defense counsel made a strategic call not to object. *See, e.g., State v. Lowell,* 249 Or App 364, 366-70, 277 P3d 588, *rev den,* 352 Or 378 (2012) (holding that the trial court committed plain error by allowing an investigating detective to testify, during the state's direct examination, that he "didn't think that [the defendant] was being very honest" during his interview); *State v. Hollywood,* 250 Or App 675, 678, 282 P3d 944 (2012) (concluding that the trial court plainly erred when it failed to strike *sua sponte* a sexual abuse diagnosis given by a state witness on direct examination that was "logically countenanced" by the prosecutor's question, even though the "challenged testimony was not explicitly elicited by the prosecutor's question"); *Higgins,* 258 Or App at 180-81 (concluding that the trial court plainly erred when it failed to strike a witness's testimony, *sua sponte,* where the witness volunteered during the state's direct examination that "'[the complainant] wasn't lying'" and where nothing in the record showed that defense counsel may have chosen not to object for strategic purposes).

By contrast, here defense counsel questioned Daly about the specific basis of her evaluation of the child on

cross-examination in order to advance an argument that Daly could not adequately evaluate the child's credibility, and after Daly offered the impermissible testimony, counsel immediately interjected that "we're not going to talk about any diagnosis." Defense counsel chose to attack the bases for Daly's conclusion rather than the conclusion itself to emphasize that Daly (and the jury) had insufficient information from which to assess whether the complaint was truthful. In that context, where defense counsel had a plausible strategic reason not to move to strike or ask for a curative instruction, and where counsel immediately sought to emphasize that Daly was not offering a "diagnosis" and then continued to question her about her ability to evaluate the child, we conclude that it is not beyond reasonable dispute that the trial court was legally obligated to strike the testimony or give an instruction without prompting from counsel. Any error by the trial court's inaction was not plain.

Affirmed.