Argued and submitted November 14, 2013, affirmed October 22, 2014, petition for review denied March 5, 2015 (356 Or 837)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSHUA BRETT WILSON,
*Defendant-Appellant.*

Washington County Circuit Court
C110595CR; A150479

337 P3d 990

Andy Simrin argued the cause for appellant. With him on the briefs was Andy Simrin PC.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment convicting him of second-degree rape, ORS 163.365; two counts of first-degree sexual abuse, ORS 163.427; three counts of unlawful delivery of marijuana to a minor, ORS 475.860(4)(a); and three counts of unlawful delivery of marijuana within 1,000 feet of a school, ORS 475.862. The evidence at trial was that defendant sexually abused L, his 13-year-old niece, after smoking marijuana with her. Defendant raises five assignments of error on appeal. We reject, without further discussion, defendant's third, fourth, and fifth assignments of error, and write only to address his first and second assignments. In those assignments of error, defendant contends that the trial court plainly erred in failing to strike, as impermissible vouching, the testimony of two witnesses that L's upset demeanor and crying when recounting the sexual abuse to them was "not fake." We conclude that any error was not plain and, accordingly, affirm.

Because defendant was convicted, we summarize the relevant facts in the light most favorable to the state. *State v. Barboe*, 253 Or App 367, 369, 290 P3d 833 (2012), *rev den*, 353 Or 714 (2013). In early 2009, L, who was then 13 years old, lived with her father, his fiancée (Bornman), and Bornman's daughter, M, who is the same age as L. Defendant was L's uncle; he was married to the sister of L's father. At that time, defendant lived with his wife and their three children in an apartment in Beaverton, located within 1,000 feet of a school. L was close to defendant and his family, having stayed with them on a number of occasions before her father became involved with Bornman in 2008.

By early 2009, L was sexually active and a marijuana user. Her father and Bornman were reluctant to leave L unattended when they were away from home. In March 2009, during L's spring break, father and Bornman sent L to stay at defendant's apartment while they were at work. L's father and Bornman did not know, as L later testified, that L had smoked marijuana with defendant at his apartment four or five times before then.

One morning, during the spring break stay, defendant invited L to smoke marijuana with him in his bedroom.

L did so and became intoxicated. L testified that defendant then "started grabbing me really rough * * * pushed me on the bed * * * [was] massaging me really, really rough * * * [and] grabbing my shoulders and my butt." Defendant took L's clothes off and then had sexual intercourse with her.

L later disclosed the sexual abuse to M, two other friends, and her boyfriend, Fuller. She told her father and Bornman about the abuse in October 2010. That disclosure was precipitated by another stay with defendant and his family (who by then had moved to L's paternal grandfather's house) during a weekend trip by father and Bornman. Before that trip and on their return, L complained about not being able to stay at home, but instead having to stay with defendant. According to Bornman's trial testimony, L appeared to be genuinely upset when Bornman and father returned from the trip. Bornman asked L what was wrong, and L disclosed and described the abuse by defendant. L then told her father about the abuse. That same day, L, her father, and Bornman went to the City of Tigard police station, where L reported the abuse to Officer Rivera. Rivera referred the matter to the Washington County Sheriff's Department, where it was investigated by Detective Rookhuyzen. Defendant was indicted for the crimes in March 2011, and the case went to trial in July of that year. During the trial, a number of witnesses described L's recounting of the sexual abuse and her demeanor while doing so, including (in order of testimony) Rivera, Rookhuyzen, Bornman, M, Fuller, and L's father. The demeanor testimony at issue was solicited by both the prosecution and the defense. Later in the trial, defense counsel asked defendant's daughter and wife about L's demeanor in family gatherings that occurred between March 2009 and October 2010.

Under questioning by the prosecutor, Rivera testified about L's emotional state during his interview of her, the same day L disclosed the sexual abuse to Bornman:

"Q. And during that time did you have a chance to observe whether or not she had any emotions one way or the other as she's talking about it?

"A. She spoke quietly, but she was sitting with her parents.

"Q. Okay.

"A.   I didn't observe much more.

"Q.   Okay. So she wasn't hysterically upset or crying, but she was soft spoken?

"A.   Yes."

Next up, Rookhuyzen spoke of interviewing L that evening. He testified that, under his direction, L had recorded a "pretext [telephone] call" to defendant at that time. The prosecutor asked whether, during the call, L "was nervous or was calm or do you remember anything about how she appeared to you, her demeanor?" Rookhuyzen responded, "She seemed pretty calm."

Bornman then testified that, upon father's and her return from a weekend trip in October 2010, L told Bornman about the sexual abuse by defendant following their use of marijuana. The prosecutor then asked about L's demeanor when she spoke with Bornman:

"Q.   Okay. And how was she—what would you say her demeanor was? And when I use the word demeanor, I mean emotionally how was she acting when she was telling you these things?

"A.   She was upset. She started crying. And her biggest fear with all of this was she loves her family. She loves her cousins. She loves her—

"[DEFENSE COUNSEL]:   Objection, Your Honor.

"A.   —aunt.

"THE COURT:   Basis?

"[DEFENSE COUNSEL]:   She's testifying to what—

"[PROSECUTOR]:   I can ask the question in a different way.

"THE COURT:   Okay.

"Q. (By [PROSECUTOR])   Did she tell you what her fears were when she was crying and telling you about the abuse that the defendant had done to her?

"A.   Her fears were that it was going to break up the family and she wasn't going to be able to see her cousins or her aunt again.

"* * * * *

"Q. Tell us how it's been on [L] since that point in time until today.

"A. [L's] not been allowed to see her cousins. She hasn't talked to her aunt. She has no involvement with that family at this point. She's not allowed to talk to any of them, and that's devastating to her. She cries about it.

"* * * * *

"Q. And with your assistance kind of by her side, did she tell her father about what had happened with [defendant]?

"A. She did.

"Q. And emotionally what was her demeanor when she was talking to her father about what had happened to her?

"A. She was crying. She was very upset, worried about what was going to happen.

"Q. And when you say crying, I guess I would like a little bit more of a description from you. Do you mean, like, she had tears coming out of her eyes and a stuffy nose because she's crying?

"A. She was crying to the point it was hard for her to talk.

"Q. And have you ever seen someone fake being upset, you know, just someone in your life—

"A. Yes.

"Q. —fake being upset? I'm sorry to ask, but how old are you?

"A. 42.

"Q. Okay, all right. So in your 42 years of living have you ever come across people that have faked tears or faked being emotional about things?

"A. As an EMT on a consistent basis.

"Q. Okay, all right. Tell me about that.

"A. We have patients that are drug seekers or patients who—I've had patients who don't want to go to jail. Being female and being an EMT, they tend to want to play on our emotions. So—

"Q. So you're a frequent target of fakers?

"A.   Frequent, yes.

"Q.   How long have you been an EMT?

"A.   Eight years.

"Q.   And when you say EMT, that's emergency medical technician?

"A.   Correct.

"Q.   You're in the ambulance, and you're the one that responds as a first responder?

"A.   Correct.

"Q.   Having had a chance to observe [L's] emotions when she was talking to you in that 10-minute conversation, and then when she was talking to her father about what happened did it appear to you as though she was faking?

"A.   This was not fake."

Defense counsel then cross-examined Bornman about "crying and fake crying" during L's conversations with Bornman and L's father:

"Q.   And you—[the prosecutor] was talking to you about levels of upset and tears and crying and fake crying. Was [L]—before you left that weekend was she crying about going to her grandfather's house?

"A.   She was not. She was just upset that she couldn't— that she had to go.

"Q.   How would you characterize her upset?

"A.   Angry.

"Q.   So she was mad?

"A.   Yes.

"Q.   Okay. And she expressed that anger and—before you left and frustration that she wasn't going to be allowed to stay at home?

"A.   Correct.

"Q.   Okay. And in fact, at the time you had chalked it up to just her wanting to stay home and spend time with her boyfriend, correct?

"A.   Correct.

"* * * * *

"Q. And you came home, and [L] was still upset that—and expressed it in ways that she was frustrated and didn't understand why she wasn't allowed to stay home, correct?

"A. Correct."

Bornman's daughter, M, then testified that L disclosed the sexual abuse to her in 2009. When asked by the prosecutor whether L seemed "happy or sad or upset or what," M replied that, "She just seemed kind of nervous and scared and just really upset." Fuller, the next witness, testified that L told him about the abuse in the fall of 2010, "So she finally after—she was getting teary eyed, and it was hard for her to say it, but finally she was able to come out with it, and she told me what happened." The prosecutor then asked Fuller about L's demeanor:

"Q. Okay. I want to talk to you about demeanor. Do you know what I mean when I use that word, demeanor?

"A. No.

"Q. I mean the way someone is acting or the way they appear, like emotions.

"A. Mm-hmm.

"Q. Sometimes people can act nervous or excited or happy or sad or upset. Do you remember how [L] was acting, what her demeanor was when you guys were having this conversation?

"A. Yeah. She was extremely upset. She was just very teary. She was practically crying. So—

"Q. Okay. And have you ever seen someone fake being upset?

"A. I mean, I'm sure I have, but I can't bring up an exact—

"Q. Okay. I mean, maybe right now you can't think of a specific time.

"A. Yeah.

"Q. Do you know what I mean when I say, like, someone is faking being upset, like they're making it look like they're upset but they're not really?

"A.   Mm-hmm.

"Q.   You know kind of what that means? When [L] was talking to you and she seemed upset to you did it look to you like she was faking it or did it look to you like she wasn't faking it?

"A.   Not at all. I did not think she was faking it."

Later in the trial, the prosecutor asked father what L was like "[e]motionally" when she described the abuse to him. He replied that L "was fairly quiet, distraught * * * may be a good word that I would describe her as." Still later, defense counsel asked defendant's aunt about "the way [L] was acting—* * * her demeanor" and whether L "seem[ed] * * * reserved * * * [c]oncerned [or] * * * [s]tandoffish" during a birthday party at defendant's home in May 2010. Defense counsel asked defendant's wife similar questions, whether L was "acting afraid" or "acting scared" of defendant after the spring of 2009. Both witnesses disclaimed any such behavior by L.

On appeal, defendant contends that the trial court erred in allowing—or more precisely, in failing to strike—the testimony of Bornman and Fuller, at the time that it was given, that L was not "faking" her agitation when she described the abuse to them. Defendant argues that testimony about the genuineness of L's emotional expressions was not demeanor testimony, but instead was impermissible vouching for the credibility of the complainant, and that the trial judge plainly erred in failing to immediately strike that testimony. The state counters that any error in failing to strike the testimony was not plain because the testimony was not obviously a comment on L's credibility and because defense counsel might plausibly have had tactical reasons to not object to the testimony to which the court owed deference. We agree with the state.

Defendant did not object to the prosecutor's inquiries of Bornman and Fuller about whether L was "faking" her displayed emotions during their conversations with her. Because the court did not expressly allow the testimony in the face of an objection, defendant cannot claim that the court erred in allowing that testimony to be given. Instead, defendant contends that the court plainly erred in failing to,

*sua sponte*, strike the testimony that L was not faking her emotional reaction.

Pursuant to ORAP 5.45, the court considers only claims of error that are "preserved in the lower court * * * provided that the appellate court may consider an error of law apparent on the record." As explained in *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990), an error is plain if (1) the error is one of law; (2) the error is "not reasonably in dispute"; and (3) the error appears on the record, meaning that "[w]e need not go outside the record or choose between competing inferences to find it." In deciding whether to exercise our discretion to correct an unpreserved error, we apply the nonexclusive factors articulated by the Supreme Court in *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991). Those include

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way[.]"

*Id.* at 382 n 6.

In defendant's view, the trial court's failure to, *sua sponte*, strike the "not faking it" testimony was plain error. He asserts that we should exercise our discretion to correct that error because the testimony went to the heart of the state's case, buttressing the credibility of the complainant, and likely affected the verdicts against defendant.

We begin by analyzing whether the testimony in question was impermissible vouching. The core principle is simple enough: "[I]n Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). That rule applies "whether the witness is testifying about the credibility of the other witness in relation to the latter's testimony at trial or is testifying about the credibility of the other witness in relation to statements made by the latter on some other occasion or for some reason unrelated to the current litigation." *State v. Kellar*, 315 Or 273, 285, 844 P2d 195 (1993). Examples of testimony

that is impermissible as a direct opinion on the honesty or credibility of another witness include (1) testimony by the victim's mother that she "'never doubted [the victim] for a second,'" *State v. Vargas-Samado*, 223 Or App 15, 17, 195 P3d 464 (2008); (2) testimony that "'there is no lying going on about what [the complainant's] telling us in this evaluation,'" *State v. Hollywood*, 250 Or App 675, 677, 282 P3d 944 (2012); and (3) testimony that the witness "'didn't think that [the defendant] was being very honest and upfront,'" *State v. Lowell*, 249 Or App 364, 366, 277 P3d 588, *rev den*, 352 Or 378 (2012). By contrast, testimony about the physical appearance of a speaker, or testimony that is solely descriptive of the manner in which a communication is made—so-called demeanor evidence—is admissible and is not vouching evidence. *See, e.g., Alcazar v. Hill*, 195 Or App 502, 510, 98 P3d 1121 (2004), *rev den*, 338 Or 488 (2005) (witness description of a police officer witness as "'100 percent kind, total gentleman, very friendly'" was a description of demeanor and not impermissible vouching); *cf. State v. Lupoli*, 348 Or 346, 362, 234 P3d 117 (2010) (stating that "observations of [a complainant's] physical characteristics and demeanor ordinarily would not be, in and of themselves, impermissible vouching").

On the other hand, "statements that fall short of * * * overt vouching also may be impermissible." *Lupoli*, 348 Or at 357. In *State v. Remme*, 173 Or App 546, 558, 23 P3d 374 (2001), we distinguished cases in which an expert witness assists the jury in evaluating the credibility of a witness by testifying on "an unusual phenomenon bearing on credibility" from those cases in which a witness inappropriately "'connects the dots' explicitly by eliciting testimony relating that phenomenon's specific application to a particular witness's testimony." *Compare State v. Preuitt*, 255 Or App 215, 223, 296 P3d 648, *rev den*, 353 Or 868 (2013) (permissible for a witness to testify to "general information regarding circumstances that indicate that a [general class of witnesses] is or is not suggestive"), *with State v. Watts*, 259 Or App 560, 562-63, 314 P3d 991 (2013) (police officer testimony that the defendant gave a "deceptive answer" because he paused before responding was an improper comment on credibility).

We have concluded that it is plain error for a trial court to not strike explicit vouching testimony *sua sponte*. *See State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988) ("We suggest in the future that if counsel attempts to elicit [testimony commenting on the credibility of a witness,] the trial judge, *sua sponte*, should summarily cut off the inquiry before a jury is contaminated by it."); *State v. Higgins*, 258 Or App 177, 178, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014) (plain error to not strike mother's testimony that she "'knew for sure'" that her daughter was not lying when the daughter said that the defendant had raped her); *B. A. v. Webb*, 253 Or App 1, 12, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) (plain error for trial court to fail to strike testimony that the witness had "no doubt" what the complainant told her was the "absolute truth" because that testimony constituted "explicit vouching for [the complainant's] credibility" and a "blatant and pervasive violation of the *Middleton/Milbradt* proscription"); *Hollywood*, 250 Or App at 678-79; *Lowell*, 249 Or App at 366-70; *see also Kellar*, 315 Or at 278-79 (court plainly erred in failing to strike testimony by physician of child witness that "'[t]here was no evidence of leading or coaching or fantasizing'" and that the child "'was obviously telling you about what happened to her body'"); *State v. McQuisten*, 97 Or App 517, 519-20, 776 P2d 1304 (1989) (concluding that trial court "had a duty, *sua sponte*, not to allow testimony" from police officer that "it is pretty hard for [a sexual assault victim] to fabricate those feelings" and that the complainant was showing "very true emotions and signs" of sexual abuse, because "the jury could reasonably have drawn the inference that the officer believed the story of the complaining witness, bolstering her credibility in its estimation").

We summarized that line of cases in *State v. Corkill*, 262 Or App 543, 552, 325 P3d 796, *rev den*, 355 Or 751 (2014):

"Each of the cases in which we have held that a trial court should have excluded evidence *sua sponte* * * * has involved true 'vouching' evidence, that is, one witness's testimony that he or she believes that another witness is or is not credible, which a party offers to bolster or undermine the veracity of that other witness. * * * That kind of testimony

> impermissibly 'invade[s] the jury's role as the sole judge of the credibility of another witness.' *State v. Charboneau,* 323 Or 38, 47, 913 P2d 308 (1996). Often, it creates a 'risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer' to an expert's opinion on that point. *State v. Southard,* 347 Or 127, 141, 218 P3d 104 (2009)."

(Some citations omitted; brackets in *Corkill.*) Thus, it is less evident that a trial judge plainly errs in not striking evidence that is not either "true vouching" evidence or indirect evidence of vouching by expert evidence related to a particular witness's credibility.

Finally, any error by the trial court in failing to strike vouching testimony is not "plain" if the testimony is subject to a "competing inference" that defense counsel had a "plausible" reason to not object to the evidence. *See State v. Gornick,* 340 Or 160, 169-70, 130 P3d 780 (2006) (no plain error if the evidence is subject to a "competing inference[]" that the defendant had a strategic purpose in not objecting to the evidence); *State v. Lovern,* 234 Or App 502, 512, 228 P3d 688 (2010) ("[T]he inference [of a strategic reason for not objecting] that the state posits is not plausible."); *see also State v. Salas-Juarez,* 264 Or App 57, 63-66, 329 P3d 805 (2014) (no plain error in failing to strike police officer testimony that another witness "'appeared to be truthful'" because the officer's testimony included factual statements supporting the defendant's theory that another person had stabbed the victim); *State v. Ramirez-Estrada,* 260 Or App 312, 313, 317 P3d 322 (2013), *rev den,* 355 Or 317 (2014) (error not plain in failing to strike nurse's testimony that complainant was "highly concerning for sexual abuse" where inferable that defense counsel wanted to emphasize the insufficient basis for that conclusion).

Applying those principles here, we conclude that it was not plain error for the trial court to fail to strike, *sua sponte,* Bornman's testimony that L's emotions were "not fake" for two reasons. First, for the most part, the testimony was about L's demeanor—Bornman's impressions of L's physical appearance. As noted, that type of evidence is admissible and not vouching evidence under *Alcazar.* Admittedly, Bornman testified about the genuineness or credibility of L's

expressed emotions. But any testimony about the expressed emotions of another—that, for example, a person seems sad, happy, or distraught—necessarily implies an assessment that the expression is genuine; otherwise the testimony would be that the person was not expressing that particular emotion. Bornman's *explicit* testimony about the genuineness of L's distress is not far removed from the *implicit* assertion of legitimacy in any demeanor testimony about emotional appearance.

More importantly, Bornman's testimony was not directed to whether she believed L was telling the truth about the sexual abuse. Instead, Bornman testified that L was genuinely upset that her disclosure of the abuse "was going to break up the family and she wasn't going to be able to see her cousins or her aunt again," and that L was "very upset, worried about what was going to happen." But that evidence did not "connect the dots" and link L's emotive conduct to the occurrence of the sexual abuse or the truthfulness of L's testimony about the abuse. It was not akin to the impermissible vouching in *McQuisten*, where the evidence was that the complainant was showing "very true emotions and signs" *of sexual abuse.* 97 Or App at 519. Thus, Bornman's testimony was one step removed from direct testimony of L's truthfulness about the sexual abuse and did not supplant the jury's assessment of L's credibility in recounting the sexual abuse to Bornman.

Both of those aspects of Bornman's testimony distinguish that evidence from the "true vouching" testimony that we identified in *Corkill* that a trial court has the obligation to strike *sua sponte.* We need not, and do not, decide whether an objection to this part of her testimony should have been sustained had it been made. *See* OEC 701 (lay opinion evidence limited to those opinions "[h]elpful to * * * the determination of a fact at issue"). We merely conclude that the evidence was not so apparently excludable as vouching testimony that the trial judge plainly erred in failing, in the absence of an objection, to strike the evidence.

In addition, in our view, there was a reasonable inference that the trial court could have drawn that defense counsel had a plausible reason not to object to the "did it

appear to you as though she was faking" question, so that the court's obligation to intervene in the examination of the witness was not clear. That is, it is readily inferable that defense counsel's failure to object to that question or to move to strike the answer was intentional. At the beginning of the prosecutor's questioning of Bornman about L's demeanor, defense counsel objected to Bornman's volunteered answer about the reasons for or legitimacy of L's distress ("And her biggest fear with all of this was she loves her family. She loves her cousins. She loves her * * * aunt."). There was no motion to strike that answer. But to an observing judge, it was apparent that defense counsel was vigilant and sensitive to the relevancy of testimony about L's motivation for her expressed emotions.

After the question was rephrased and answered differently, the prosecutor then began a series of questions about Bornman's experience in distinguishing fake from real emotions ("And have you ever seen someone fake being upset * * *?"). There are eight questions along this "fakery line," none of which was objected to by defense counsel, before the question about L's emotional genuineness is asked. The only relevance of those questions is to buttress the credibility of Bornman's answer to the obviously imminent question about whether L was "faking" it. Given those eight opportunities to object, the trial judge could readily conclude that defense counsel's failure to object to the "did it appear to you as though she was faking" question was not inadvertent or happenstance, but intentional and purposeful.

That plausible purpose could have been this: Defense counsel could have wanted to establish that L was upset about the repercussions of her disclosure of the abuse or her inability to stay home and visit with her boyfriend, and *not upset about disclosing the actual abuse itself*, in order to help establish that the abuse did not happen. The previous witnesses established that L had calmly discussed the abuse with others that same day. Rivera testified that L was not "hysterically upset or crying, but * * * was soft spoken" when L disclosed the abuse to him. Rookhuyzen stated that L was "pretty calm" when she discussed the abuse with defendant. The trial court could have inferred that defense counsel wanted to reinforce that L was not visibly upset about the

abuse, but instead was genuinely upset about other things, and, for that reason, acquiesced in the prosecutor's inquiries of Bornman.

And, in fact, that is what defense counsel proceeded to do. He cross-examined Bornman about the "crying and fake crying" to establish that L was "still upset that—and expressed it in ways that she was frustrated and didn't understand why she wasn't allowed to stay home." Indeed, defense counsel in his closing argument to the jury emphasized that "the reaction, the emotional reaction was in response to—or contemporaneous with she was upset about not being able to see her cousins. It wasn't contemporaneous with describing th[e] actions of March 2009."

For much the same reason, it was not plain error for the trial court to not strike Fuller's answer to the question "did it look to you like [L] was faking it or did it look to you like she wasn't faking it." While Fuller did associate L's "practically crying" demeanor with the sexual abuse disclosure, by the time of that question, the trial judge nonetheless could infer that both the prosecutor and defense counsel regarded the evidence as permissible demeanor testimony and relevant to their respective theories of the case.

In sum, because the evidence in question was not clearly vouching for L's credibility in accusing defendant of sexual abuse, but was more akin to permissible testimony about L's demeanor, and because there were plausible reasons that the evidence could support the defense of the case, the trial court did not plainly err in failing to strike the testimony *sua sponte*.

Affirmed.