Argued and submitted November 10, 2014, resubmitted en banc October 15, affirmed December 30, 2015, petition for review denied May 5, 2016
(359 Or 525)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## KENNETH EUGENE INMAN,
*Defendant-Appellant.*

Curry County Circuit Court
12CR0651; A153569

366 P3d 721

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Gregory A. Rios, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General.

Before Haselton, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Nakamoto, Hadlock, Egan, DeVore, Tookey, Garrett, and Flynn, Judges.

HADLOCK, J.

## HADLOCK, J.

Defendant challenges his convictions for first-degree sodomy, a violation of ORS 163.405, and harassment, a violation of ORS 166.065. He first argues that the trial court erred by "permitting" a police detective to comment on the credibility of another witness, the sodomy victim, despite the lack of any objection by defendant to that aspect of the detective's testimony. As explained below, even if we agreed that the trial court plainly erred by not striking that testimony *sua sponte*, we would decline to exercise our discretion to correct the error. Accordingly, we need not determine whether the trial court plainly erred in the way that defendant contends. Defendant also argues that the trial court erred when it made various rulings related to defendant's conviction by nonunanimous jury verdicts (11-1 on sodomy; 10-2 on harassment) and when it imposed the 300-month statutorily mandated sentence on his sodomy conviction. We reject each of those latter arguments without further discussion. Accordingly, we affirm.

In addressing defendant's argument that the trial court plainly erred by failing to strike certain testimony *sua sponte*, we consider the evidence in the light most favorable to the state. *State v. Wilson*, 266 Or App 481, 482, 337 P3d 990, *rev den*, 356 Or 837 (2014). Later, in exploring whether we should exercise our discretion to correct any such error, we consider all of the pertinent evidence and other relevant aspects of the record. *Cf. State v. Blaylock*, 267 Or App 455, 456 n 1, 341 P3d 758 (2014), *rev den*, 357 Or 299 (2015) (explaining that "we look at all pertinent evidence" when assessing whether evidentiary error was harmless). We describe the facts in keeping with those standards.

This case involves several children, including J (the sodomy victim), E (the harassment victim, and a friend of J), R (another of J's friends), and Q (J's older brother). In early 2012, defendant moved into the home where R lived with her parents and siblings; he stayed there for five or six months. J and E, who then were about seven years old, and Q, who was about eleven years old, often played at R's house during the summer. One afternoon in June or July, Q saw defendant in an upstairs bedroom in that house, bending down in front

of J with his face near her "privates." J's pants were down around her ankles and she had no underwear on. Q heard defendant ask J if he could "lick her privates"; Q also heard J ask defendant to stop what he was doing. Q ran downstairs and tried to tell R's parents what was happening, but they were occupied and did not pay attention to him. Q went home and told his mother (who is also J's mother) what had happened, but she testified at trial that she had not understood Q and, consequently, did not immediately learn of the abuse.

On August 15, J's mother did receive information about the abuse, which prompted her to call the sheriff's office. A deputy sheriff spoke with J and Q before the case was referred to the Brookings Police Department. The next day, J's mother met with a detective from that department, McCourt, and told him that defendant had abused J "a couple of times."

McCourt then contacted defendant and asked him about the allegations. Defendant told McCourt that the children had "conspired against him to make up these allegations" because "he wouldn't play with them anymore." Defendant also told McCourt that he had kissed J on the nose and on the cheeks, and that he might have contacted her "crotch area" when they were "playing around." Defendant denied performing oral sex on J, telling McCourt that he "would never do anything they wouldn't like or want." Defendant also told McCourt that J had told him that somebody else had performed oral sex on her about a month earlier.

McCourt interviewed Q on the day after his mother first contacted the sheriff's office about the abuse. Shortly thereafter, Q was interviewed by Dotson, a forensic interviewer at the local child-advocacy center. In addition, McCourt coordinated a "pretext call" from Q to defendant. During that call, McCourt gave "information and questions to [Q] about what to say," because the child was having difficulty talking to defendant. McCourt "kind of felt bad while [they] were doing it," but he believed that the pretext call "was necessary to try to get as much evidence as we could." Defendant apparently made no admissions during that call.

Q also spoke with a prosecutor a few times in the weeks before trial.

McCourt also spoke briefly with J on the day following her mother's report to the sheriff's office, but he "did not talk to [her] about the case at all." That same day, Dotson conducted a forensic interview of J, who told Dotson that she was at the center because "a guy molest [her]." Dotson testified that the word "molest" is not a word that a child J's age typically would know or use. Dotson asked J if she knew what "molest" means and J said that she had forgotten. J then told Dotson that defendant had licked her vagina with his tongue and that it happened once, at night, about a week before the interview.[1] Dotson testified that about 50 percent of children J's age use the word "vagina." J also spoke with the prosecutor before trial.

At some point, E (one of J's friends) disclosed that, one day while the children were playing at R's house, defendant had grabbed her legs and looked under her dress. At trial, she testified that defendant's actions made her feel nervous because she did not "know what [he] was going to do." E told defendant to stop, but he did not, so she ran back to her home.

During her forensic interview, J also disclosed that, on a particular occasion when defendant and E were present, defendant looked under the two girls' dresses. J also described another incident when defendant looked under E's dress while he pretended to take a nap.

The state initially charged defendant with two counts of first-degree sodomy and three counts of harassment, but later dismissed some of those charges. Consequently, defendant was tried on one count of first-degree sodomy (against J) and one count of harassment (against E).

In his opening statement, defendant suggested that "the amount of contact and discussions about this" that occurred between J, Q, and their mother "before the police ever got involved" might cause the jurors to question

---

[1] J testified at trial that defendant licked her private parts more than once, at nighttime. She did not appear to recall that she had told Dotson that it happened only once.

whether certain standards for sex-crime investigations had been met. Q, J, Dotson, McCourt, and E then testified to the facts described above. In apparent support of an argument that the children had been interviewed too many times, defendant cross-examined Dotson about protocols for investigating child sex-abuse cases. In response, she agreed with defense counsel's statement that, according to those guidelines, "you're to try to minimize the number of interviews with the child." Dotson also acknowledged that she believed that J had spoken to her mother about the abuse.

During his direct examination, McCourt was asked about conversations that he and prosecutors had with J shortly before trial. McCourt responded with the testimony that is the subject of defendant's "vouching" argument on appeal:

"Q.   *** What was the purpose of those visits?

"A.   We like to make—We like to talk to the witness again before the trial just to see, make sure they're going to be able to—if they're going to be able to come testify in a court, make sure they still remember, or if they have—if they decide—Let's say that they were lying to us or they told us a fib, we like to find that out before we get to this point so we can—we don't have to waste your time and the court's time. And we talked to her on the Thursday of last week.

"Q.   Okay. And if there had been any inconsistencies or any problems, wouldn't those have needed to be reported to all parties?

"A.   Yes.

"Q.   And you did not write any such a report or *** note any such inconsistencies at any time?

"A.   I did not."

Defendant did not object to that testimony. The prosecutor did not linger on the topic of McCourt's conversations with J, but instead moved to questioning McCourt about the interviews of Q and the other children.

After the state rested, defendant called J's mother as a witness and questioned her about how she interacted with J after she learned of the abuse. In addition, defendant

asked J's mother about her understanding of when the abuse had occurred. Defendant also called McCourt and questioned him about the information that he had received from J's mother on the same topic.

Defendant then testified on his own behalf. He described the relationships among the children and testified that he played with them, "swinging them around in circles" and catching them as they jumped off of things. Defendant denied ever having attempted to perform oral sex on J; he also denied having tried to look between E's legs. On cross-examination, defendant downplayed what he had told McCourt about the children having been upset at him for not playing with them; he testified that the children had only once said that they "were going to get [defendant] for not playing with them" after he got tired, and that it had been a "very minor thing."

Neither the state nor defendant referred to McCourt's "vouching" testimony in the closing arguments. Rather, in its closing argument, the state first summarized the evidence and how it related to the elements of the charged crimes. The state then acknowledged some discrepancies in the children's description of events, for example, whether the abuse occurred at night or during the day, and whether it happened only once or multiple times. The state suggested that the discrepancies could be based on defendant actually having abused J more than once, or might be based on the difficulty that the young children had in remembering and describing exactly what had happened. For his part, defendant emphasized the discrepancies in the children's statements, J's use of terms like "molest" and "vagina," and the number of times that the children had spoken to adults about the abuse before trial. Defendant urged the jurors to determine, based on those considerations, that they had at least reasonable doubt about whether the abuse had occurred.

The jury convicted defendant by nonunanimous verdicts and the trial court imposed the statutorily required 300-month prison sentence on the sodomy conviction, to be followed by lifetime post-prison supervision, with a concurrent 120-day sentence on the harassment conviction. This appeal followed.

On appeal, defendant argues that the trial court plainly erred by "permitting"—or, more precisely, by failing to strike—McCourt's testimony that he spoke to J the week before trial in part to make sure that she had not lied. Defendant acknowledges that he did not object to McCourt's statements at trial, but characterizes the evidence as impermissible "vouching" testimony that the trial court had a duty to strike *sua sponte*. Defendant contends that the trial court's failure to take that action constitutes plain error that we should correct by reversing the judgment and remanding for a new trial.

Our consideration of an unpreserved claim of error generally encompasses two steps. First, we determine whether the trial court plainly erred. Error is "plain" if

"(1) the error is one of law, (2) the error is 'obvious, not reasonably in dispute,' and (3) the error 'appears on the face of the record,' so that we need not 'go outside the record to identify the error or choose between competing inferences, and the facts constituting the error are irrefutable.' *State v. Reyes-Camarena*, 330 Or 431, 435, 7 P3d 522 (2000) (internal quotation marks omitted)."

*State v. Corkill*, 262 Or App 543, 551, 325 P3d 796, *rev den*, 355 Or 751 (2014).

Second, if we determine that a trial court plainly erred, we then consider whether we should exercise our discretion to correct that error.

"That discretion entails making a prudential call that takes into account an array of considerations, such as the competing interests of the parties, the nature of the case, the gravity of the error, and the ends of justice in the particular case."

*State v. Vanornum*, 354 Or 614, 630, 317 P3d 889 (2013) (citations omitted).

In this case, the state concedes that McCourt's testimony "likely was an implicit comment on [J's] credibility." Nonetheless, the state argues that the trial court did not plainly err in admitting that testimony for two reasons. First, the state contends, defendant opened the door to that testimony when he suggested that J had been improperly

subjected to multiple interviews and that her claims were, therefore, suspect. Second, the state argues, defendant may have made a strategic decision not to object to the testimony, given its possible admissibility in response to defendant's theory that J had been interviewed too many times.

We need not decide whether the trial court plainly erred in admitting McCourt's statements because, for the reasons that follow, we would not exercise our discretion to correct any plain error that might exist on this record.

The principle that appellate courts generally will not consider unpreserved claims of error is longstanding. As the Supreme Court stated in 1944, "[i]t is only in rare and exceptional cases that this court will notice an alleged error where no ruling has been sought from the trial judge." *Hotelling v. Walther*, 174 Or 381, 385, 148 P2d 933 (1944). Somewhat more recently, the court explained in *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991), that an appellate court's decision to exercise its discretion to address an unpreserved claim of error "should be made with utmost caution" because "[s]uch an action is contrary to the strong policies requiring preservation and raising of error." *Ailes* provided a nonexclusive list of considerations that an appellate court should consider when deciding whether to exercise that discretion:

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Id.* at 382 n 6.

Sixteen years after the Supreme Court issued its opinion in *Ailes*, the court expressed its continued agreement with, and intent to "adhere to that statement" in *Ailes*, which the court characterized as setting out "precisely what [the Supreme Court] expects" when this court considers whether to exercise its discretion to correct plain error. *State v. Fults*, 343 Or 515, 521-22, 173 P3d 822 (2007).

The Supreme Court emphasized that the requirement that this court articulate its reasons for exercising its discretion is "'not a requirement of mere form.'" *Id.* at 522 (quoting *Ailes*, 312 Or at 382). In that context, the court observed, considerations that may factor into the discretionary analysis include "the interest of the judicial system in avoiding unnecessary repetitive sentencing proceedings, as well as its interest in requiring preservation of error." *Id.* at 523.

More recently, the Supreme Court again emphasized that "a decision to review a plain error is one to be made with the 'utmost caution' because such review undercuts the policies served by the preservation doctrine." *Vanornum*, 354 Or at 630-31. The court discussed those policies in detail in *Peeples v. Lampert*, 345 Or 209, 191 P3d 637 (2008):

> "Those policies are prudential in nature. Preservation gives a trial court the chance to consider and rule on a contention, thereby possibly avoiding an error altogether or correcting one already made, which in turn may obviate the need for an appeal. Preservation also ensures fairness to an opposing party, by permitting the opposing party to respond to a contention and by otherwise not taking the opposing party by surprise. Finally, preservation fosters full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it. Our jurisprudence, thus, has embraced the preservation requirement, not to promote form over substance but to promote an efficient administration of justice and the saving of judicial time."

*Id.* at 219-20 (internal quotation marks, brackets, and citations omitted). Yet again, the court emphasized that, even when there is "an error apparent on the record, about which there is no reasonable dispute," an appellate court "has discretion to consider [that] error, but it must do so with the 'utmost caution,' because of the strong policy reasons favoring preservation." *Id.* at 219.

With those principles in mind, we first consider the gravity of any error that could be said to have plainly occurred. *See Vanornum*, 354 Or at 630 (citing "the gravity of the error" as one consideration in the discretionary analysis); *Ailes*, 312 Or at 382 n 6 (same). In determining whether

any error was grave, we consider the likelihood that the error affected the outcome of the proceeding below. *State v. Ramirez*, 343 Or 505, 513, 173 P3d 817 (2007). Thus, we explained in *State v. Pergande*, 270 Or App 280, 348 P3d 245 (2015), that we would correct the trial court's plain error in admitting testimony that commented on the credibility of two children who allegedly were abuse victims because that testimony likely influenced the verdict:

> "As we have stated before, in a case that boils down to a credibility contest between the defendant and the victim, as here: evidence commenting on the credibility of either was likely to be harmful. [The witness's] testimony was a direct comment on the credibility of [the children]. That error was grave because this is a sexual abuse case with no physical evidence of abuse and [the witness] was presented as an expert in treating sexual abuse victims with significant experience in spotting indications of suggestion or coaching. [The witness] was also the long-term counselor of both of the girls and familiar with them. Those facts present a significant risk that the jury's credibility determinations were affected by [her] testimony."

*Id.* at 285-86 (internal quotation marks and citations omitted); *see also State v. Roelle*, 259 Or App 44, 50, 312 P3d 555 (2013) (discussing the likely effect of erroneous admission of "prior bad acts" evidence in explaining that the error was grave).

Again, this is the testimony by McCourt that defendant contends the trial court should have stricken *sua sponte*:

> "A. * * * We like to talk to the witness again before the trial just to see, make sure they're going to be able to—if they're going to be able to come testify in a court, make sure they still remember, or if they have—if they decide— *Let's say that they were lying to us or they told us a fib, we like to find that out before we get to this point so we can—we don't waste your time and the court's time.* And we talked to her on the Thursday of last week.

> "Q. Okay. And if there had been any inconsistencies or any problems, wouldn't those have needed to be reported to all parties?

> "A. Yes.

"Q. And you did not write any such a report or *** note any such inconsistencies at any time?

"A. I did not."

(Emphasis added.)

The emphasized part of that testimony was objectionable, in that it could be understood to vouch for J's credibility.[2] That is, the statement could have conveyed to the jury that McCourt did not believe that J had lied or told a fib; otherwise, he would have taken steps to prevent the court's time from being "waste[d]." *See Corkill*, 262 Or App at 552 ("true 'vouching' evidence" is a "witness's testimony that he or she believes that another witness is or is not credible, which a party offers to bolster or undermine the veracity of that other witness").

However, we reject defendant's contention that, in addition, McCourt plainly vouched for J's veracity when he gave testimony implying that there were not "any inconsistencies or any problems" in the child's statements. "[G]enerally speaking, testimony that a witness's statements were consistent with earlier statements that the witness made does not impermissibly vouch for the witness's credibility." *State v. Beauvais*, 357 Or 524, 547, 354 P3d 680 (2015); *see also State v. Viranond*, 346 Or 451, 460, 212 P3d 1252 (2009) (rejecting argument that one witness's testimony that statements by another witness "were consistent with one another serves no real purpose other than indirectly to bolster" that other witness's credibility; observing that, at least in some contexts, "testimony that witnesses' earlier statements were consistent with their trial testimony merely established that the witnesses told the same story, true or false, more than once"). Thus, McCourt's acknowledgement that he had not noticed any inconsistencies in J's statements was not objectionable. True, we might have considered the prosecutor's

---

[2] Our observation that the testimony was objectionable as "vouching" evidence does not, of course, equate with a holding that the trial court plainly erred by not excluding that testimony *sua sponte*. *See Corkill*, 262 Or App at 551 (distinguishing between the question of "whether the prosecutor's cross-examination of defendant was objectionable" and the different question of "whether the trial court plainly erred by not interrupting the prosecutor's cross-examination of defendant *sua sponte*").

reference to other, unspecified "problems" to be problematic had defendant objected to testimony on that point and had the trial court overruled that objection. But given *Beauvais* and *Viranond*, we reject defendant's argument that McCourt's testimony that there were not "any inconsistencies or any problems" in J's statements *plainly* was inadmissible and that the trial court plainly erred in not excluding it *sua sponte.*

However, that latter comment does provide context when we consider the gravity of any error that the trial court may have plainly committed when it did not strike McCourt's testimony suggesting that he spoke with J to make sure that she had not fibbed. In that regard, we first observe that, although McCourt's "fibbing" testimony could be understood to vouch for J's credibility, he did not purport to base that opinion on any particular analysis of the child's veracity. If anything, the prosecutor's repeated references to "inconsistencies" in her next questions to McCourt suggest that McCourt's opinion that J had not "fibbed" was based on little more than his belief that the child's story had remained consistent over time.

That is not the kind of expert vouching testimony that most often has prompted this court to reverse a criminal conviction or a judgment favoring a civil plaintiff because the trial court should have stricken vouching testimony *sua sponte.* For example, we have reversed when trial courts failed to *sua sponte* strike testimony delivered by: a witness who was "presented as an expert in treating sexual abuse victims with significant experience in spotting indications of suggestion or coaching";[3] a mental-health counselor and a psychosexual evaluator who "emphatically and repeatedly offered their * * * opinions that [the] plaintiff was truthful in her accounts of the alleged abuse";[4] or a detective whose testimony "was couched in terms of his expertise in identifying untruthfulness."[5] Thus, we have explained, "In many cases

---

[3] *Pergande*, 270 Or App at 286.

[4] *B. A. v. Webb*, 253 Or App 1, 10-17, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013).

[5] *State v. Lowell*, 253 Or App 364, 366-67, 277 P3d 588, *rev den*, 352 Or 378 (2012).

where credibility is critical to the outcome, even a single 'vouching' statement by a witness * * * with years of experience and training in the field of child abuse prevention, can be given considerable weight by the jury." *State v. Ross*, 271 Or App 1, 7, 349 P3d 620, *rev den*, 357 Or 743 (2015).[6]

This is not such a case. McCourt was not presented as an expert in identifying untruthfulness; nor was he presented as an expert in the field of childhood sexual abuse. In our view, his identity as a law-enforcement officer, standing alone, would not necessarily have led the jury to believe that he had special insight into J's veracity. Moreover, as explained above, McCourt's statements suggesting that J had not "fibbed" were closely associated with his agreement that he had not observed inconsistencies or unspecified "problems" in the child's statements, suggesting that his opinion of the child's veracity was based on little more than the unchanging nature of her story—a fact to which McCourt permissibly could testify. Accordingly, it is unlikely that McCourt's "fibbing" testimony would have carried the same weight with the jury as the expert vouching testimony at issue in the cases discussed above. In addition, McCourt stated only once, and briefly, that he had interviewed J shortly before trial so he could make sure that she was not lying, and the prosecutor promptly redirected McCourt to permissible topics. Consequently, McCourt's vouching testimony was not the sort of emphatic or repeated comment on credibility that has sometimes prompted this court to reverse because the trial court should have stricken the testimony *sua sponte*. In short, any error that occurred here is not nearly as grave as the errors that prompted reversals in those other cases.

We next consider "the nature of the case." *Ailes*, 312 Or at 382 n 6. In that regard, defendant argues that J's credibility was "at the heart of the state's case" and "the totality of the evidence was hardly overwhelming." We disagree. This is not a case, like some, in which the complainant's testimony constitutes the sole direct evidence of sexual abuse.

---

[6] *But see State v. Higgins*, 258 Or App 177, 178-79, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014) (reversing because trial court plainly erred by not excluding a lay witness's testimony that she "knew for sure" that her daughter was telling the truth about an alleged rape).

To the contrary, J's report that defendant had licked her vagina was confirmed by Q, who testified that he had seen defendant bent down with his face near J's private parts, asking for permission to lick her there. And, although E did not testify about that incident of abuse, she confirmed J's report that defendant had looked under E's dress. Thus, this case does not "boil[] down to a credibility contest between the defendant and the victim." *See Pergande*, 270 Or App at 285 (describing a case that did present such a credibility contest). That fact, too, counsels against an exercise of *Ailes* discretion. *See State v. Pickett*, 246 Or App 62, 64-65, 264 P3d 209 (2011), *rev den*, 341 Or 541 (2012) (declining to correct plain error in admitting a diagnosis of sexual abuse in the absence of physical evidence of abuse because admission of the diagnosis "did not likely affect the court's verdict" in the case, which "did not amount to merely a 'swearing match' between the victim * * * and defendant"; rather, the record included additional evidence of the defendant's guilt, including his admission to having abused the victim).

We also consider "whether the policies behind the general rule requiring preservation of error have been served in the case in another way." *Ailes*, 312 Or at 382 n 6. They have not. Had defendant objected to McCourt's testimony, the trial court could have easily cured any error by striking the testimony and instructing the jury to disregard it. That consideration has not prevented us from exercising our discretion to correct plain "vouching error" in cases where the comment on credibility was so egregious that it was not clear that a curative instruction would have been sufficient. *See State v. Higgins*, 258 Or App, 177, 182, 308 P3d 352 (2013). Here, however, where McCourt's vouching testimony was brief and was not delivered by an expert witness or other person with particular insight into the victim's veracity, a curative instruction almost certainly would have sufficed had defendant objected to the testimony. *See State v. Fulmer*, 229 Or App 386, 395, 211 P3d 942 (2009), *rev den*, 348 Or 13 (2010) ("[I]f a trial court does erroneously allow a witness to comment on the credibility of another witness, reversal is not required if the trial court directs the jury to disregard the inappropriate testimony."). In other words,

any retrial that we might require in this case—with its attendant toll on the participants and the judicial system as a whole—would have been avoided entirely had defendant simply objected to McCourt's testimony at the time it was delivered.

The judicial system's interest in avoiding that kind of "unnecessary repetitive legal proceeding[], as well as its interest in requiring preservation of error," is weighty. *Dept. of Human Services v. E. L. G.*, 270 Or App 308, 315, 347 P3d 825 (2015). That principle is illustrated by the Supreme Court's decision to affirm in *State v. Cox*, 337 Or 477, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005), an aggravated murder case in which the defendant was sentenced to death. In *Cox*, the defendant "identifie[d] 15 instances during his trial in which witnesses testified concerning another person's out-of-court statements." *Id.* at 500. The defendant argued "that admitting this testimony violate[d] his rights under the federal Confrontation Clause." *Id.* He acknowledged that he had not objected to the evidence at trial, but argued that the Supreme Court should exercise its discretion to correct what he characterized as plain error. *Id.* The court declined to do so, even assuming that constitutional violations had occurred:

> "Even if we assume that the error is plain, this is not an appropriate occasion to reach it. As the state notes, if defendant had raised a timely objection, the state could have found other ways to prove the facts that defendant now challenges, or it could have chosen to forgo the testimony and avoid the issue. In these circumstances, we decline to exercise our discretion to reach the unpreserved issues that defendant asks us to decide."

*Id.* Here, too, the state easily could have decided not to ask McCourt any further questions about his pretrial conversation with J had defendant successfully objected to the "fibbing" testimony at trial. We understand from *Cox*, as well as cases like *Vanornum, Fults,* and *Peeples*, discussed above, that the ease with which any error could have been avoided or corrected should be a significant factor in an appellate court's decision whether to exercise its discretion to correct a plain, but unpreserved, error.

And that brings us to the last factor that we deem pertinent to our decision in this case: "the ends of justice in the particular case." *Ailes*, 312 Or at 382 n 6. Certainly, defendant has a compelling interest in not being wrongfully convicted of a serious crime. *See State v. Reynolds*, 250 Or App 516, 522, 280 P3d 1046, *rev den*, 352 Or 666 (2012). But that is true in virtually every case in which defendants raise unpreserved challenges to their criminal convictions. And in *this* case, we do not believe that the ends of justice weigh in favor of reversal. As explained, we have determined that the error in this case was not particularly grave, in terms of its likelihood of affecting the verdict, that the case did not amount to a simple swearing match between defendant and the victim, that any need for a retrial could have been easily avoided, and that the judicial system has a strong interest in avoiding such a retrial. No one of those factors, considered alone, necessarily would persuade us not to exercise our discretion to correct any plain error that might have occurred. When we consider those factors together, however, along with the Supreme Court's admonition to exercise the "utmost caution" in addressing unpreserved claims of error, we conclude that the ends of justice militate against such an exercise of discretion in this case.

The dissent's contrary conclusion makes several points to which we briefly respond. First, the dissent suggests that admission of McCourt's vouching testimony could not be characterized as "harmless" in the context of this case, given the lack of physical evidence of abuse and the inconsistencies in the children's descriptions of events. *See* 275 Or App at 957-58 (Sercombe, J., dissenting). That may be. That is, any error in admitting McCourt's testimony might not be deemed harmless if we were considering its effect in the context of a preserved evidentiary objection. But the harmless-error analysis does not govern our discretionary decision about whether to address unpreserved claims of error. Instead, we must balance the gravity of any error, in the context of the "nature of the case," against the other factors set forth in *Ailes*, *Vanornum*, *Fults*, and other plain-error cases. This decision reflects our view of the appropriate weighing of those factors.

The dissent also downplays both the importance of preservation principles—a point which, as we have noted, the Supreme Court continues to emphasize—and the judicial system's interest in avoiding repetitive proceedings. In doing so, the dissent refers to *Reynolds*, 250 Or App at 524, a case in which we exercised our discretion to address the defendant's unpreserved claim that his conviction for third-degree assault was not based on constitutionally sufficient evidence. 275 Or App at 954-55 (Sercombe, J., dissenting). The comparison to *Reynolds* is inapt. In that case, the state conceded that the evidence in the record did not support the challenged conviction. 250 Or App at 518. Moreover, we concluded that, had the defendant moved for a judgment of acquittal in the trial court, it was "unlikely that the record would have developed differently," noting that the state did "not contend otherwise." *Id.* at 524. Under those circumstances, it was, perhaps, unsurprising that we rejected "the 'interest in requiring preservation of error' factor" as dispositive in *Reynolds*, as the dissent states here. 275 Or App at 954-55 (Sercombe, J., dissenting).

This case differs from *Reynolds* in two significant respects. First, the result in *Reynolds* was straightforward: The defendant's conviction for third-degree assault was reversed and remanded for entry of a judgment of conviction for, instead, fourth-degree assault. 250 Or App at 527. In this case, reversal would be followed by a new trial in which, at least theoretically, the evidence presented over two days of trial—including the testimony delivered by the child witnesses—might be essentially the same as it was at the original trial held in January 2013, except that McCourt would not testify that he had spoken with J before trial to ensure that she had not lied or told a "fib." The judicial system's—and the children's—interest in avoiding that kind of retrial cannot be equated to the system's interest in avoiding a simple remand for entry of a less-serious conviction, as in *Reynolds*.

Second, as noted above, we emphasized in *Reynolds* that the evidentiary record would not have developed differently had the defendant preserved his claim of error; that is, the state apparently did not contend that it might have been able to present evidence supporting a conviction for

third-degree assault. Here, though, the record presumably would have developed differently had defendant objected to McCourt's testimony. The trial court presumably would have stricken that testimony and instructed the jury to disregard it.

The dissent concludes that that presumptive difference in how the record would have developed, had defendant objected to McCourt's testimony on "vouching" grounds, is so significant that defendant "would likely" prevail if he pursued post-conviction relief on the theory that his trial lawyer should have made that objection. 275 Or App at 960-61 (Sercombe, J., dissenting). But the ends of justice do not require a retrial simply because some view it as "likely" that defendant would prevail in a later post-conviction case. The necessarily limited scope of the record on direct appeal makes it difficult, if not impossible, for us to predict the eventual result in any such collateral proceeding. On this record, we know nothing about why defendant's lawyer did not object to McCourt's testimony. Nor can we adequately assess whether—perhaps for reasons that are not reflected in the trial-court record—a decision not to object could have been a choice within the wide range of options available to a reasonably competent lawyer under the circumstances then presented, or whether defendant was prejudiced by that kind of decision. If defendant's lawyer acted reasonably by not objecting to McCourt's testimony, or if defendant was not prejudiced by the absence of an objection, then justice would not demand a retrial based on the trial court not having stricken that testimony *sua sponte*.

In the end, we cannot conclude from the record on direct appeal that there is *no* meaningful chance either that defendant's lawyer exercised reasonable professional skill and judgment when he did not object to McCourt's testimony or that, given the totality of the circumstances as reflected in a yet-to-be-developed post-conviction record, defendant was not prejudiced by the absence of an objection. The purpose of post-conviction litigation is to allow development of a record that permits a factfinder to make fully informed decisions on those points. *See Pereida-Alba v. Coursey*, 356 Or 654, 661-62, 342 P3d 70 (2015) (describing elements of a post-conviction claim based on an inadequate-assistance

theory). Defendant's remedy—if any—for the lack of an objection to McCourt's testimony must be in that type of collateral proceeding.

Affirmed.

Haselton, C. J., and Ortega, DeVore, and Garrett, JJ., join in this opinion.

**ARMSTRONG, J.,** concurring.

Defendant contends that the trial court committed plain error by failing to strike *sua sponte* testimony by Detective McCourt that defendant believes impermissibly vouched for the credibility of J, the sodomy victim in this case. I am not persuaded that the testimony about which defendant complains necessarily vouched for J's credibility, and, consequently, I would reject defendant's assignment of error on the ground that the trial court was not required to strike the testimony *sua sponte*.

Vouching testimony is testimony in which a witness expresses a personal opinion about the credibility of another witness's statements or testimony. It is well established that a trial court must strike vouching testimony *sua sponte* if it is given at trial. *See, e.g., State v. Corkill,* 262 Or App 543, 552, 325 P3d 796, *rev den,* 355 Or 751 (2014) (summarizing cases). However, that requirement does not extend to testimony that is capable of being understood *not* to express a personal opinion about the credibility of another witness's statements or testimony. *See, e.g., State v. Wilson,* 266 Or App 481, 491-93, 337 P3d 837 (2014), *rev den,* 356 Or 837 (2015).

Here, the testimony by McCourt can be understood not to express an opinion about the credibility of J's statements and testimony. McCourt was asked on direct examination about the purpose of a meeting that he and the prosecutors had had with J shortly before trial:

"Q. * * * What was the purpose of those visits?

"A. We like to make—We like to talk to the witness again before the trial just to see, make sure they're going to be able to—if they're going to be able to come testify in a court, make sure they still remember, *or if they have—if*

*they decide*—Let's say that they were lying to us or they told us a fib, we like to find that out before we get to this point so we can—we don't have to waste your time and the court's time. And we talked to her on the Thursday of last week.

"Q.   Okay. And if there had been any inconsistencies or any problems, wouldn't those have needed to be reported to all parties?

"A.   Yes.

"Q.   And you did not write any such a report or * * * note any such inconsistencies at any time?

"A.   I did not."

(Emphasis added.)

As the emphasized portion of the testimony indicates, McCourt could be understood to be describing a process designed, among other things, to give witnesses the opportunity to recant their earlier statements, because witnesses sometimes decide to acknowledge to the police and prosecutors that they had lied in making them. In turn, McCourt's testimony could be understood not to express McCourt's personal opinion about whether J had been truthful in making the statements that she did. Hence, the trial court was not required to strike the testimony *sua sponte.*

Nakamoto, Egan, and Flynn, JJ., join in this concurrence.

**ORTEGA, J.,** concurring.

For the reasons expressed in the lead opinion, even assuming for the sake of argument that the trial court plainly erred when it failed to strike certain testimony *sua sponte,* I would not exercise my discretion to address defendant's unpreserved claim of error. Additionally, however, though the lead opinion dodges the question of whether the error is plain, I would conclude that the trial court did not plainly err in failing to strike the testimony at issue, because that testimony did not vouch for the credibility of the victim— and certainly not so clearly that the trial court was obligated to strike it without a motion from the defendant. For

that additional reason, I concur in the lead opinion's decision to affirm the trial court's judgment.

As I will explain, the dissenting opinion jumps several logical steps to reach its conclusion that the testimony at issue constitutes "true vouching—that is, an explicit comment by one witness on the credibility of another witness." 275 Or App at 950 (Sercombe, J., dissenting). In my view, the testimony did not vouch for the credibility of the victim at all; the most that can be said is that the testimony amounted to "indirect" vouching, as we have described it in our case law. Accordingly, I do not believe that it was plain error for the trial court to fail to strike the testimony without a motion under the circumstances presented here. To treat the court's inaction as plain error under these circumstances would constitute a significant and unwarranted extension of our vouching jurisprudence and a failure to sufficiently grapple with the differences between reviewing such testimony on appeal and hearing such testimony in the moment in the midst of a trial. Such an extension likewise fails to grapple appropriately with the attendant toll on the witnesses, the victims, and the judicial system as a whole. I do not agree that it makes sense to require a new trial in a situation like this rather than requiring a defendant to object to testimony that constitutes, at worst, indirect vouching.

I begin with some background regarding cases in which we have held that it was plain error to fail to strike vouching testimony *sua sponte*. In *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), the Supreme Court held that the trial court erred in failing to grant a motion to strike opinion testimony from a psychotherapist that a witness was telling the truth. The court went on to "suggest in the future that if counsel attempts to elicit similar testimony the trial judge, *sua sponte*, should summarily cut off the inquiry before a jury is contaminated by it." *Id.* at 630.

In a series of cases that followed, we have found that it was plain error to fail to strike vouching testimony *sua sponte*. However, we have done so only when the testimony directly vouched for a witness's credibility—so-called "true" vouching. *State v. Corkill*, 262 Or App 543, 552, 325 P3d 796, *rev den*, 355 Or 751 (2014) (noting that the strike

rule has, thus far, only been applied in cases involving "true" vouching); *see also State v. Higgins*, 258 Or App 177, 180-81, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014) (trial court plainly erred by failing to strike *sua sponte* testimony from a mother that she "'knew for sure'" that her daughter was not lying when she reported that the defendant raped her); *B. A. v. Webb*, 253 Or App 1, 6-17, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) (trial court plainly erred in failing to strike a counselor's testimony that she had "'no doubt'" that the complainant told her the "'absolute truth'"); *State v. Hollywood*, 250 Or App 675, 677-80, 680, 282 P3d 944 (2012) (trial court plainly erred by failing to strike *sua sponte* a child abuse investigator's testimony that "'there is no lying going on about what [the complainant is] telling us in this evaluation'"); *State v. Lowell*, 249 Or App 364, 366-68, 369, 277 P3d 588 (2012) (trial court plainly erred by failing to strike *sua sponte* testimony from a detective that he "'didn't think that [the defendant] was being very honest and upfront'").[1] On the other hand, it is *not* plain error not to strike vouching testimony *sua sponte* if the testimony is "not so apparently excludable as vouching testimony." *See State v. Wilson*, 266 Or App 481, 493, 495, 337 P3d 990 (2014) (holding that, "because the evidence in question was not clearly vouching for L's credibility in accusing [the] defendant of sexual abuse, but was more akin to permissible testimony about L's demeanor, * * * the trial court did not plainly err in failing to strike the testimony *sua sponte*").

Although "indirect" vouching statements may well be impermissible, we have never held that a trial court must strike indirect vouching statements without an objection. For example, in *State v. Lupoli*, 348 Or 346, 362, 234 P3d 117 (2010), the Supreme Court held that a nurse's statements explaining the basis for her diagnosis were impermissible

---

[1] Some of our cases of so-called "true" vouching involve testimony that was not actually elicited by counsel—and I question whether it makes sense to require trial courts, in the heat of trial, to strike such testimony without an objection. *See, e.g., Higgins*, 258 Or App at 178, 181 (concluding that the trial court erred in failing to strike vouching testimony *sua sponte* even though it was not elicited by counsel's question); *Hollywood*, 250 Or App at 678-80 (same). Doing so certainly constitutes an extension of the Supreme Court's original concern in *Milbradt* with situations where "counsel attempts to elicit" vouching testimony. 305 Or at 630.

because they "implicitly declar[ed], with each statement and description, why she had found [the victim] to be credible." Similarly, the Supreme Court held that a doctor's statement that her diagnosis was based, in part, on the fact that "'[t]here was no evidence of leading or coaching or fantasizing'" by the victim was impermissible. *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993). However, in both cases, the testimony at issue had been the subject of an objection. *Lupoli*, 348 Or at 356; *Keller*, 315 Or at 278-79.

We have, on occasion, declined to treat vouching as plain error where it was more indirect or implied. One witness, for example, stated, "'I believe the statistic at Liberty House is 96 to 98 percent of the time when a child makes a disclosure about abuse, there's truth to it,'" but he "stopped short of stating that [the victim] was like the 96 to 98 percent of Liberty House complainants whose reports were truthful." *State v. Harrison*, 267 Or App 571, 575, 577, 350 P3d 777 (2014). There was no objection to that testimony at trial and, on appeal, the defendant argued that the court should have struck the testimony *sua sponte*. *Id.* at 572. Relying on *Corkill* and *Wilson*, we held that, because there was a reasonable dispute as to whether there was impermissible vouching, the court did not plainly err by failing to strike the disputed testimony *sua sponte*. *Id.* at 577. In another case, where an officer gave testimony that may or may not have been vouching for the victim's credibility and the defendant failed to object to it at trial, we held that the "error [was] not plain" and declined to consider whether the court erred in failing to strike the testimony *sua sponte*. *State v. Hunt*, 271 Or App 347, 350, 350 P3d 521 (2015). In another case, also named *State v. Hunt*, 270 Or App 206, 208, 346 P3d 1285 (2015), a witness testified that he "'thought the information [the victim] gave [him] was just the best of her knowledge at the time.'" We concluded that such testimony was not "true vouching" and held that "the trial court did not plainly err when it did not strike it on its own initiative." *Id.* at 213.

The only cases in which we arguably have held that it was error for the court not to strike an indirect vouching statement *sua sponte* are those involving a diagnosis of sexual abuse by an expert where there is an absence of physical evidence. In such cases, because there is no physical evidence

to corroborate a victim's testimony, a witness's diagnosis of sexual abuse necessarily implies that the witness believes that the victim is credible. *See State v. Southard*, 347 Or 127, 141, 218 P3d 104 (2009). Based on the standard set out in *Southard*, we have consistently held that it is plain error for a court not to strike such "indirect" vouching testimony *sua sponte. See State v. Lopez-Cruz*, 256 Or App 32, 299 P3d 569 (2013); *State v. Pekarek*, 249 Or App 400, 277 P3d 594 (2012); *State v. Cox*, 248 Or App 325, 273 P3d 299 (2012); *State v. Codon*, 247 Or App 756, 270 P3d 409 (2012); *State v. Feller*, 247 Or App 416, 269 P3d 110 (2011); *State v. Bahmatov*, 244 Or App 50, 260 P3d 592 (2011); *State v. Childs*, 243 Or App 129, 259 P3d 77, *rev den*, 350 Or 573 (2011); *State v. Potts*, 242 Or App 352, 255 P3d 614 (2011); *State v. Gonzales*, 241 Or App 353, 250 P3d 418, *rev den*, 350 Or 571 (2011); *State v. Merrimon*, 234 Or App 515, 228 P3d 666 (2010). However, beyond that narrow category of cases, we have declined to find that it is plain error for a trial court not to strike indirect vouching testimony *sua sponte*.

With that background, I turn to the testimony at issue in this case, which was as follows:

"Q.  \* \* \* What was the purpose of those visits?

"A.  \* \* \* *We* like to talk to the witness again before the trial just to see, make sure *they*'re going to be able to—if *they*'re going to be able to come testify in a court, make sure *they* still remember, or if *they* have—if *they* decide—Let's say that *they* were lying to *us* or *they* told *us* a fib, *we* like to find that out before *we* get to this point so *we* can—*we* don't have to waste your time and the court's time. And *we* talked to her on the Thursday of last week.

"Q.  Okay. And if there had been any inconsistencies or any problems, wouldn't those have needed to be reported to all parties?

"A.  Yes.

"Q.  And you did not write any such a report or \* \* \* note any such inconsistencies at any time?

"A.  I did not."

(Emphases added.)

The dissent mischaracterizes the testimony as being that McCourt interviewed the victim to determine whether *she* was "lying to [them] or * * * told [them] a fib." 275 Or App at 949 (Sercombe, J., dissenting). On the contrary, although the officer was asked about the purpose of follow-up interviews with the victim, the testimony at issue describes the purpose of such visits generally. The officer's statement was simply a general description of what officers and prosecutors often do to prepare witnesses for trial, including giving them an opportunity to recant. The officer consistently uses the words "we" and "they," as opposed to "I" and "she/her/J." The officer's further testimony was only that he would have reported any inconsistencies or problems, and did not do so in this case. The lack of such a report does not indicate anything about whether the officer believed the victim. One can infer—as indeed can be inferred in any case where prosecution proceeds—that the officer believed the victim, but the lack of a report of inconsistencies or problems does not necessarily indicate anything about the officer's beliefs, and McCourt did not directly comment on the victim's credibility or directly indicate that he believed her. Consequently, this is not an instance of vouching at all. At most, it is a case of indirect vouching, and the trial court did not plainly err in failing to strike the testimony *sua sponte.*

We recently addressed a similar case in which an officer testified about his approach for reviewing with a child the difference between telling the truth and lying, which, on appeal, the defendant argued amounted to vouching for the child's credibility. *Smith v. Franke*, 266 Or App 473, 337 P3d 986 (2014), *rev den*, 356 Or 689 (2015). The defendant did not object to that testimony at trial. *Id.* at 474. We held the officer's testimony did not constitute vouching (direct or indirect) because it did not specifically touch on the witness's opinion about the victim's truthfulness. *Id.* at 479. Here, as in *Smith*, the officer's statement arguably was not vouching at all because it did not specifically include the officer's opinion about the witness's credibility—he simply stated that he had found no inconsistencies in the victim's statements. The officer stated, in part, "Let's say that they were lying to us or they told us a fib, we like to find that out before we get to this point." The officer's statements, in context, merely

suggest that the victim had an opportunity to recant but did not do so. That could have been because (1) the victim had indeed previously told the truth or (2) the victim previously lied and, for whatever reason, did not recant when given the opportunity. The officer did not express an opinion as to whether he believed it was the former or the latter. He simply stated that the victim was not inconsistent, a neutral comment on the victim's credibility.

In this case, the state concedes that the officer's statements were "likely * * * an implicit comment on [J's] credibility." However, even assuming that the statements indeed vouched for the victim's credibility, they constituted no more than "indirect" vouching because the officer's statements were not clear, direct opinion statements about her credibility. We have never held that a trial court was required to strike such testimony in the heat of trial, without a motion, and we should not view the trial court's failure to do so in this case as plain error. To do so is a significant and unwarranted extension of our vouching jurisprudence. Consequently, and for the additional reasons cited in Judge Hadlock's lead opinion, I concur in the decision to affirm the trial court's opinion.

**SERCOMBE, J.,** dissenting.

### INTRODUCTION

Vouching evidence, by its nature, is quite prejudicial to a defendant, and its admission usurps the province of the jury and undermines the fairness of a trial. Because of that, in criminal cases where a trial court has plainly erred by failing to strike true vouching testimony by a lay or expert witness, and where the credibility of the verified witness is a significant issue in the case, we have exercised our discretion to correct the error. Here, despite the explicit testimony by a police officer about the truthfulness of the victim, whose credibility was identified by both parties to be a core issue in the case, the lead opinion does not follow our precedents to correct an error that is, by its nature, both plain and grave in character. Instead, it reasons that the error should not be corrected because (1) the prejudice to defendant was not as bad as it would have been if the vouching had been by an expert witness, (2) there was some

evidence of the sodomy crime in addition to the victim's testimony, and (3) correction of plain error is usually a bad idea because it undercuts preservation principles.

With respect, those reasons do not justify the outcome reached by the lead opinion: (1) Because of its pernicious effect, we have condemned the introduction of explicit or "true" vouching testimony, whether voiced by a lay or an expert witness, and whether the vouching is direct or indirect, (2) although there might be little prejudice to a defendant by vouching testimony when there is overwhelming evidence of the crime, that is not the case here, and (3) the Supreme Court has classified this type of error—failure to strike true vouching testimony—as so plainly wrong that it needs no predicate objection to be correctible. Accordingly, lack of preservation is unimportant in evaluating whether to correct that type of error. In my view, then, the lead opinion improperly relies on those considerations in declining to correct the error in this case.

In addition, the lead opinion fails to credit factors—the gravity of the error or the needs of justice in the case—that have prompted our court in other cases to correct this type of plain error. We have, for example, been more inclined to exercise discretion to correct plain error when its potential consequence is a lengthy term of imprisonment, such as the 25-year term meted to defendant here. We also assess any error as consequential, and more demanding of review, when the case is a close one. As evidenced by the split verdicts on both charges, this is such a case. We have also favored providing relief on direct review that would be likely in later post-conviction relief proceedings, as is the case here, where the failure of trial counsel to object to and attempt to cure the vouching testimony was likely to be inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution. We are less inclined to correct error when it is induced or invited by the defendant, when the failure to object could be advantageous to the defendant, or when the unchallenged evidence is cumulative. But none of those circumstances is present here.

Thus, I dissent from the lead opinion's failure to correct plain and grave error of the type that we have readily

corrected in previous cases, that is based upon a rationale that is out of step with our case law, and that fails to consider significant factors that have guided the exercise of our review discretion in the past.

## PLAIN ERROR

I begin with the question reserved by the lead opinion—whether the trial court committed plain error in failing to strike the direct vouching testimony of Detective McCourt and to caution the jury to not consider that testimony. As noted by the lead opinion, during direct examination, McCourt was asked about conversations that he and prosecutors had with J after her forensic interview and shortly before trial. McCourt responded with the testimony that is the subject of defendant's vouching argument on appeal:

"Q. Now, who did you make the arrangements with to have [J] brought to do an interview?

"A. I contacted her mother * * *.

"Q. And [her mother] agreed to bring her daughter down to the PD for an interview?

"A. Yes, she did.

"Q. Okay. And so any conversations you had with [J] after this were after that forensic interview?

"A. Yes.

"Q. Okay. Now, have you had an opportunity to speak with [J] in the presence of the district attorney's office?

"A. Yes, I have.

"Q. And were those—What was the purpose of those visits?

"A. We like to make—We like to talk to the witness again before the trial just to see, make sure they're going to be able to—if they're going to be able to come testify in a court, make sure they still remember, or if they have—if they decide—Let's say that they were lying to us or they told us a fib, we like to find that out before we get to this point so we can—we don't have to waste your time and the court's time. And we talked to her on the Thursday of last week.

"Q. Okay. And if there had been any inconsistencies or any problems, wouldn't those have needed to be reported to all parties?

"A. Yes.

"Q. And you did not write any such a report or *** note any such inconsistencies at any time?

"A. I did not."

The lead opinion concedes that McCourt's testimony constitutes "objectionable" vouching because it "could have conveyed to the jury that McCourt did not believe that J had lied or told a fib." 275 Or App at 931 (Hadlock, J., lead opinion). The state likewise acknowledges that McCourt's testimony was an "implicit comment on [J's] credibility." Two particular aspects of the testimony vouch for J's credibility. First, McCourt stated that he spoke with J both to "make sure" that she was "going to be able to come testify in a court, make sure [she] still remember[ed]" *and* to see if J was "lying to us or * * * told us a fib," so that, if either were true, the victim's testimony would not "have to waste your time and the court's time." Put simply, McCourt testified that he evaluated J's truthfulness to determine if the prosecution should continue.

Second, McCourt testified that, if there had been "any inconsistencies or any problems," he would have reported those inconsistencies or problems to the parties, and he did not. The "inconsistencies" referenced were issues with J's memory and the recountings of the crimes ("make sure they still remember").[1] "Any problems," however, refer to the other point of the interview, to assess the victim's truthfulness (finding out "that they were lying to us or they told us a fib"). The jury could have concluded that McCourt believed J, otherwise he would have reported her untruthfulness to the parties as potentially exculpatory evidence. Thus, reduced to its essence, McCourt's testimony was that he determined that the victim was truthful in telling the

---

[1] McCourt's interview of J was the first time she spoke with him about the details of the crimes. Presumably, the "inconsistencies" refer to inconsistencies between that telling and the truth. If not, I agree with the lead opinion that it is not vouching to testify that a witness's statements were consistent with other statements. 275 Or App at 931-32 (Hadlock, J., lead opinion).

circumstances of the crimes. Although McCourt did not simply state, "I believed J was telling the truth," he said much the same thing—*viz.*, "I did not stop the prosecution or inform the parties because I believed J was telling the truth." That testimony was offered by the state ("And did you not write any such report * * *?") for one reason alone—to bolster J's credibility.[2]

Because that testimony is true vouching—that is, an explicit comment by one witness on the credibility of another witness that is offered to bolster the veracity of that witness—the court's failure to strike it is indisputably plain error. "[I]n Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983). It is plain error for a trial court to not strike true vouching testimony *sua sponte*, whether that witness is an expert or a lay witness. *See State v. Milbradt*, 305 Or 621, 630, 756 P2d 620 (1988) ("We suggest in the future that if counsel attempts to elicit [testimony commenting on the credibility of a witness,] the trial judge, *sua sponte*, should summarily cut off the inquiry before a jury is contaminated by it."); *State v. Higgins*, 258 Or App 177, 178, 308 P3d 352 (2013), *rev den*, 354 Or 700 (2014) (plain error to not strike mother's testimony that she "'knew for sure'" that her daughter was not lying when the daughter said that the defendant had raped her); *B. A. v. Webb*, 253 Or App 1, 12, 289 P3d 300 (2012), *rev den*, 353 Or 428 (2013) (plain error for trial court to fail to strike testimony that the witness had "'no doubt'" what the complainant told her was the "'absolute truth'" because that testimony constituted "explicit vouching for [the complainant's] credibility" and a "blatant and pervasive violation of the *Middleton/Milbradt* proscription"); *State v. Hollywood*, 250 Or App 675, 677-79, 282 P3d 944 (2012) (plain error to not strike testimony that "'there is no lying going on about what [the complainant's] telling us

---

[2] In her concurrence, Judge Ortega suggests that McCourt's testimony was "simply a general description of what officers and prosecutors often do to prepare witnesses for trial" and not specific to McCourt's interview of J. 275 Or App at 945 (Ortega, J., concurring). It is readily apparent, however, that, in testifying about the "purpose of those visits," McCourt is testifying about the visits with J immediately before the trial.

in this evaluation'"); *State v. Lowell*, 249 Or App 364, 365-66, 277 P3d 588, *rev den*, 352 Or 378 (2012) (plain error to allow testimony to stand that the witness "'didn't think that [the defendant] was being very honest and upfront'").

We summarized that line of cases in *State v. Corkill*, 262 Or App 543, 552, 325 P3d 796, *rev den*, 355 Or 751 (2014):

> "Each of the cases in which we have held that a trial court should have excluded evidence *sua sponte* * * * has involved true 'vouching' evidence, that is, one witness's testimony that he or she believes that another witness is or is not credible, which a party offers to bolster or undermine the veracity of that other witness. That kind of testimony impermissibly 'invade[s] the jury's role as the sole judge of the credibility of another witness.' *State v. Charboneau*, 323 Or 38, 47, 913 P2d 308 (1996). Often, it creates a 'risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer' to an expert's opinion on that point. *State v. Southard*, 347 Or 127, 141, 218 P3d 104 (2009)."

(Brackets in *Corkill*; some citations omitted.)

I agree with Judge Ortega's assertion in her concurrence that there is a distinction in plain error vouching cases between the "true vouching" identified in *Corkill*—"one witness's testimony that he or she believes that another witness is or is not credible, which a party offers to bolster or undermine the veracity of that other witness"—and testimony that is not explicitly vouching for another that a judge is not obliged to strike. In *Corkill*, for example, we concluded that it was not plain error for the court not to strike the defendant's answers to a prosecutor's questions about whether police officer witnesses were lying when their testimony contradicted that of the defendant. *Id.* at 553. Those inquiries, we concluded, went not to bolstering or undermining a different witness's testimony but to "undermining the credibility of the witness who is presently on the stand." *Id.* As such, it was not "true vouching."

In *State v. Wilson*, 266 Or App 481, 487-88, 492-93, 337 P3d 990 (2014), *rev den*, 356 Or 837 (2015), we determined that a court did not plainly err in not striking testimony by

a witness that the complainant was not "'faking it'" in being "'extremely upset.'" We concluded that the testimony was not about the truthfulness of the complainant's testimony about the sexual abuse, but was more akin to permissible testimony about the complainant's demeanor. *Id.* at 493. As such, it was not true or explicit vouching. In *Easter v. Mills*, 239 Or App 209, 214, 243 P3d 1212 (2010), *rev den*, 350 Or 130 (2011), testimony by the victim's mother that the victim did not have a motive to lie was held not to be impermissible vouching because the "mother was not asked whether she believed that [the victim] was telling the truth (nor did her answer reveal whether she believed that [the victim] was telling the truth)."

But, contrary to Judge Ortega's assertion, it is plain error not to strike explicit vouching whether the vouching is direct (opinion testimony that the witness was truthful) or indirect (testimony that the witness took or failed to take an action or reached a conclusion because of an opinion that a witness was truthful). In *State v. McQuisten*, 97 Or App 517, 519 n 2, 520, 776 P2d 1304 (1989), we concluded that the trial court "had a duty, *sua sponte,* not to allow testimony" from a police officer that "it is pretty hard for [a sexual assault victim] to fabricate those feelings" and that the complainant was showing "very true emotions and signs" of sexual abuse, because "the jury could reasonably have drawn the inference that the officer believed the story of the complaining witness, bolstering her credibility in its estimation." In *Higgins*, 258 Or App at 178, it was plain error for a trial court to not strike testimony by the complainant's mother that she waited for "'so many hours'" to let the complainant repeat her story so she "'knew for sure that [the complainant] wasn't lying.'" And, based on *State v. Keller*, 315 Or 273, 844 P3d 195 (1993), and *State v. Lupoli*, 348 Or 346, 234 P3d 117 (2010), we have repeatedly held that it is plain error for a court not to strike indirect vouching testimony in the form of expert testimony about the status of a witness based on the expert's opinion of the witness's credibility. *See, e.g., State v. Wells*, 257 Or App 808, 809, 308 P3d 274 (2013) (plain error not to strike CARES evaluator's diagnosis of sexual abuse based on an interview of the victim); *State v. Preuitt*, 255 Or App 215, 222-23, 296 P3d 648,

*rev den*, 353 Or 868 (2013) (plain error not to strike expert's conclusions that she had no "'concerns or red flags'" that a complainant's testimony of being abused was a "'story that she had adopted from somewhere else'").

Thus, the error in failing to strike McCourt's testimony is no less plain because it is indirect and explicit vouching. McCourt's testimony is as plainly inadmissible as the admission of the indirect comment on the victim's credibility that was admitted, over the defendant's objection, in *State v. Ferguson*, 247 Or App 747, 271 P3d 150 (2012). In that case, the complainant alleged that she had been drugged and raped by the defendant. She reported that allegation to her father, who directed another person to call the police. The father testified at trial that he "'let the police be called'" and that he would not have done so if he thought that the complainant "'had just made a mistake, got drunk, but had sex with somebody knowingly.'" *Id*. at 752. We concluded that the court erred in admitting that "indirect comment on the victim's credibility." *Id*. at 754. So too here, McCourt's testimony that he interviewed J to determine if she was telling the truth and that he would have, but did not, report to the parties if he had concluded that there were "any inconsistencies or any problems," is plainly inadmissible as vouching for the truthfulness of J. Thus, the trial court's inaction in the face of true vouching testimony was plainly erroneous; the court's duty to assure fundamentally fair proceedings was unqualified and needed no objection or other prompting.

## EXERCISE OF DISCRETION TO REVIEW

Even where error is plain, "the appellate court must exercise its discretion to consider or not to consider the error[.]" *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991). In deciding whether to exercise our discretion to correct an unpreserved error, we apply the nonexclusive factors articulated by the Supreme Court in *Ailes*:

"[I]n deciding whether to exercise its discretion to consider an error of law apparent on the face of the record, among the factors that a court may consider are: the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether

the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.,* whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error. *State v. Brown,* 310 Or 347, 355-56, 800 P2d 259 (1990); *State v. Avent,* 209 Or 181, 183, 302 P2d 549 (1956). Those factors do not comprise a necessary or complete checklist; they merely are some of the permissible considerations."

*Id.* at 382 n 6. Additional factors that are relevant in deciding whether to exercise discretion to correct an error were listed in *State v. Fults,* 343 Or 515, 523, 173 P3d 822 (2007):

"Although we may accept in the abstract the court's statement that '[t]he state has no valid interest in requiring defendant to serve an unlawful sentence,' other factors also must be considered and may outweigh that one. Among the factors that may apply in this case are: (1) defendant's apparent encouragement of the judge's choice; (2) the role of the concurrent, permissible 36-month probationary sentence; (3) the possibility that defendant made a strategic choice not to object to the sentence; and (4) the interest of the judicial system in avoiding unnecessary repetitive sentencing proceedings, as well as its interest in requiring preservation of error."

I note that some of the *Ailes/Fults* factors are present in every case and lack dispositive significance. It is true, in the abstract, that neither the state nor a defendant has an interest in a criminal conviction procured through improper evidence. The "competing interests of the parties" factor, then, in that type of case, would always favor review and correction. As *Fults* suggests, however, "other factors also must be considered and may outweigh that one." *Id.*

On the other hand, the "interest in requiring preservation of error" factor would always suggest not exercising discretion to correct the error. The lead opinion, in fact, primarily relies on that factor to support its disposition of the case. 275 Or App at 934-35 (Hadlock, J., lead opinion) ("In other words, any retrial that we might require in this case—with its attendant toll on the participants and the judicial system as a whole—would have been avoided entirely had defendant simply objected to McCourt's testimony at the

time it was delivered."). We rejected that analysis as dispositive in *State v. Reynolds*, 250 Or App 516, 525, 280 P3d 1046 (2012):

> "Admittedly, the preservation principle of 'judicial efficiency' would not be served by review of defendant's unpreserved claim of error. Had defendant moved for a judgment of acquittal on the third-degree assault charge, that relief could have been obtained sooner and with less consumption of judicial resources. That inefficiency, however, is present in nearly all cases where review of unpreserved issues are under consideration. That consideration does not distinguish those cases where review should be allowed from those where it should not. We said as much in *State v. Morris*, 217 Or App 271, 274, 174 P3d 1127 (2007), *rev den*, 344 Or 671 (2008):
>
> > "'To be sure, as the state suggests, if defendant had raised his present objection before the trial court, error might well have been avoided. But that is true in many "plain error" cases—indeed, in virtually all such cases except for those in which the claim of error is based on an intervening, post-judgment change in the law.'
> >
> > "Thus, the error in this case is plain and serious, and its correction will not undermine the relevant principles that underlie the preservation rule."

*See also State v. Martino*, 245 Or App 594, 597, 262 P3d 1111 (2011) (rejecting state's argument that "'had [the] defendant made a timely objection, the state may have been able to produce the necessary evidence'" as reason to not exercise *Ailes* discretion). Unfortunately, the lead opinion *does* treat the preservation of error factor as dispositive here.

Other *Ailes/Fults* factors are not present in this case, and play little part in the analysis. Although we have declined to exercise *Ailes* discretion when a defendant's failure to object to or move to strike the offending evidence was a plausible tactic to advance the defense, that is not the case here. *See, e.g., State v. Ramirez-Estrada*, 260 Or App 312, 319-26, 317 P3d 322 (2013), *rev den*, 355 Or 317 (2014) (elicitation by defense counsel of vouching testimony from medical witness as part of strategy to question the sufficiency of the medical examination by that witness). Defendant's position at trial was that J, the sodomy victim, was not credible

because she had been repeatedly interviewed prior to trial and her recollections had been altered by those interviews. The state suggests that defendant's position invited McCourt's testimony about the reason for his interview, and defense counsel did not object to the vouching because he figured that the objection would be overruled given that invitation. In my view, defendant's position that the victim was not credible did not invite McCourt's testimony that she was. *Cf. State v. S. J. F.*, 247 Or App 321, 328 n 2, 269 P3d 83 (2011) (defense counsel's failure to object to holding a hearing without the defendant being present did not invite the error).

There was no plausible reason for defense counsel to not object to McCourt's vouching. Defendant gained "no conceivable advantage" in not advancing an objection. *State v. Dorsey*, 259 Or App 441, 446-47, 314 P3d 331 (2013) (rejecting "'strategic choice'" contention where "there was no conceivable advantage to [the] defendant in not advancing" the proper argument); *see also Berg v. Nooth*, 258 Or App 286, 298, 309 P3d 164 (2013) ("The holdings in *Milbradt, Lupoli,* and *Southard* suggest that it will be the rare case in which reasonable trial strategy will include allowing witnesses—particularly those with pertinent expertise—to vouch for the credibility of people who report sexual abuse."). Thus, that consideration does not counsel against exercising our discretion to correct the error.

Instead, there are aspects of the "gravity of the error" and the "ends of justice in the particular case" factors here that support the exercise of discretion to correct the plain error. First, we have readily concluded that an error is "grave" when it could have resulted in a wrongful criminal conviction or otherwise increased the term of incarceration of a defendant. *See Reynolds*, 250 Or App at 522 (entry of criminal conviction without sufficient proof is grave error of "constitutional magnitude"); *State v. Ryder*, 230 Or App 432, 435, 216 P3d 895 (2009) ("[T]he gravity of the error—*viz.*, the imposition of an additional felony conviction—strongly militates in favor of the exercise of discretion."); *State v. Newson*, 218 Or App 393, 397, 180 P3d 67 (2008) ("[T]he 'gravity of the error,' *Ailes*, 312 Or at 382 n 6—the imposition of a sentence three years greater than the statutorily

prescribed maximum—is substantial."). Here, the consequence of leaving undisturbed McCourt's vouching for the victim is that defendant was imprisoned for 25 years.

In addition, we are more likely to consider the error to be grave if it "likely affected" the outcome of the case or where the prejudicial effect of the error is "significant" or "substantial." *See, e.g., State v. Pergande,* 270 Or App 280, 286, 348 P3d 245 (2015) ("Those facts present a significant risk that the jury's credibility determinations were affected by Terry's testimony."); *State v. Roelle,* 259 Or App 44, 50, 312 P3d 555 (2013) ("[W]e conclude that the admission of that evidence likely affected the jury's verdict."); *B. A.,* 253 Or App at 12-13 ("[T]he outcome depend[ed] very substantially, perhaps exclusively, on the jury's determination of the parties' relative credibility."). Thus, in cases where the victim's credibility is a significant issue, an error in permitting vouching of the victim's credibility is considered to be grave. Here, both the prosecution and the defense, in closing arguments, characterized the case as one involving a credibility contest. Defense counsel argued, "Now, the credibility is the issue here, the credibility of the entire State's case." The prosecutor countered, "Either way, if you believe that what [the victims] saw and what they witnessed, if you believe and find them credible, the material elements of the charge have been satisfied."

Contrary to the lead opinion's reasoning, in cases where the victim's credibility is a significant issue, we have found vouching to be prejudicial error even when there is some other corroborating evidence of the crime. For example, in *Simpson v. Coursey,* 224 Or App 145, 148, 153, 197 P3d 68 (2008), *rev den,* 346 Or 184 (2009), a vouching case with facts analogous to this case, we noted that

"[t]he state * * * called as a witness the victim's brother, who corroborated some aspects of the victim's account of events, specifically that petitioner, the victim, and he wrestled together in petitioner's bedroom, and that on a few occasions when they were all watching television in petitioner's bedroom, petitioner asked him to leave the room to get petitioner a drink of water or milk. The victim's friend testified that the victim had reported the abuse to her at

the time and again, more recently, but that the victim had asked her not to say anything about it both times.

"* * * * *

"* * * Petitioner's criminal trial, like the trials in *Milbradt* and *McQuisten*, lacked any physical evidence to corroborate either the victim's or petitioner's account. The *Milbradt* court characterized that situation as a 'credibility contest,' in which improper vouching is even more prejudicial to the defendant than in other criminal trials, due to the critical importance of the credibility of the victim's and the defendant's competing testimony."

*See also State v. Brown,* 256 Or App 774, 778, 302 P3d 1214 (2013) (medical expert vouching prejudicial even "though there was other evidence of sexual abuse"); *Berg,* 258 Or App at 301-02 (inadequate assistance of counsel in failing to object to vouching testimony was prejudicial notwithstanding "the existence of corroborating physical evidence").

Instead, we have refused to exercise *Ailes* discretion to correct a vouching error for lack of prejudice only when there is overwhelming evidence of a defendant's guilt so that the testimony of the verified witness is truly cumulative. *See, e.g., State v. Pickett,* 246 Or App 62, 65, 264 P3d 209 (2011), *rev den,* 351 Or 541 (2012) (vouching by medical witness not prejudicial where the defendant admitted to sexually abusing the victim and there was substantiating photographic evidence of the abuse); *State v. Childs,* 243 Or App 129, 131-32, 259 P3d 77, *rev den,* 350 Or 573 (2011) (medical witness vouching not likely to have affected the court's verdict where there was photographic evidence corroborating the victim's account of the abuse and the court explicitly eschewed any reliance on the expert testimony).

Here, the eyewitness testimony of Q was hardly overwhelming. There were inconsistencies between the testimony of Q and the victim, J, about details of the sodomy, such as whether the abuse occurred during the daytime or nighttime and whether their mother first learned about the abuse from Q or J. Q, who was 11 years old, testified several times that "I have a bad memory" and "I can barely

remember * * * a couple minutes ago." His testimony falls well short of the physical proof found sufficient to classify vouching error as harmless in *Pickett* and *Childs.*

Moreover, an error is more likely to be considered grave when the case is a close one, as reflected by a split jury verdict to convict. *See, e.g., State v. Logston,* 270 Or App 296, 307, 347 P3d 352 (2015); *State v. Abraham,* 265 Or App 240, 247, 335 P3d 293 (2014); *State v. Villanueva-Villanueva,* 262 Or App 530, 535, 325 P3d 783 (2014); *Berg,* 258 Or App at 302; *State v. Edblom,* 257 Or App 22, 33, 303 P3d 1001 (2013); *Brown,* 256 Or App at 778; *Simpson,* 224 Or App at 154; *State v. Olsen,* 220 Or App 85, 92, 185 P3d 467 (2008); *State v. Smith,* 194 Or App 697, 706, 96 P3d 1234 (2004). Here, the jury found defendant guilty by an 11-to-1 vote on the sodomy charge and by a 10-to-2 vote on the harassment charge. In short, we should exercise discretion to correct the vouching error because the victim's credibility was a significant issue in an otherwise close case.

McCourt's credibility with the jury as a police officer is another feature of the case that supports categorizing the vouching error as grave. In my view, a police officer is likely to be viewed by a jury as a more credible witness than a lay witness, and vouching testimony by a police officer from the exercise of official duties is more likely to be prejudicial to a defendant than testimony by a lay witness. Here, McCourt testified that part of his "duties as a detective" was "investigat[ing] these types of incidents" and to officially report if there was "any problem," including lying, in the testimony of the victim. Thus, as presented to the jury, McCourt's vouching for the victim was just part of his job.

In *Simpson,* we concluded that vouching by a police officer in an otherwise close case was prejudicial to the petitioner. There, the petitioner sought post-conviction relief from his conviction of first-degree sexual abuse, because his criminal trial counsel did not move to strike a police officer's description of the victim as "'very honest, very straightforward.'" 224 Or App at 148. We concluded that the officer's vouching testimony was particularly prejudicial to the petitioner's case:

> "We readily conclude that [the police officer's] testimony had at least some likelihood of influencing the jury and thus affecting the verdict. The jury heard a uniformed police detective vouch for the victim's honesty. The possibility that the testimony affected the verdict is magnified by the fact that the criminal trial appears to have been an extremely close case for the jury. It returned a verdict of acquittal on three of the four counts of sexual abuse, and its guilty verdict on the fourth count was by a 10 to 2 vote. The charges * * * turned on whether the jury believed the victim's testimony. Thus, the possibility that [the police officer's] testimony vouching for the credibility of the victim affected the verdict is very real."

*Id.* at 154. That same analysis informs the "gravity of the error" and the "ends of justice" inquiries here.

Finally, we have concluded that the ends of justice factor supports an exercise of *Ailes* discretion to correct plain error when a defendant would likely obtain the same result in post-conviction proceedings. We reiterated that principle in *Reynolds*:

> "We conclude that the ends of justice in this case militate in favor of correcting the plain error. As the dissent notes, it is likely that defendant would be able to obtain post-conviction relief from the erroneous conviction. However, we conclude, contrary to the dissent, that the availability of post-conviction relief is a reason in support of affirmatively exercising our discretion. As we have noted in the plain error context before,
>
>> "'[w]e see no reason, and the state offers none, as to why [the] defendant should be made to jump through more procedural hoops before he can get the relief to which he is entitled. In this case, we are in a position to order the same relief to which [the] defendant would be entitled under a post-conviction proceeding, and we do so in the interests of judicial economy.'
>
> "*State v. Cleveland,* 148 Or App 97, 100, 939 P2d 94, *rev den,* 325 Or 621 (1997). There is, in short, no reason to deny review where it would result in more unnecessary proceedings and, ultimately, less judicial efficiency."

250 Or App at 526 (brackets in *Reynolds*); *see also State v. Gammon,* 264 Or App 420, 421, 332 P3d 347, *rev den,* 356 Or

575 (2014) (same); *State v. Simkins*, 263 Or App 459, 461-62, 330 P3d 1235 (2014) (same). Here, the failure of defendant's trial counsel to object to McCourt's vouching testimony was inadequate assistance of counsel under Article I, section 11, and would likely entitle defendant to post-conviction relief. *See Simpson*, 224 Or App at 156; *see also Berg*, 258 Or App at 298-99 (failure of trial counsel to object to the testimony of a vouching witness and prosecutor's closing argument was inadequate assistance entitling the petitioner to post-conviction relief). In my view, we should provide that relief to defendant sooner than later.

## CONCLUSIONS

I disagree with the lead opinion's conclusion that the court ought not to exercise discretion to correct the plain error in this case because the vouching was not by a medical expert witness and because there was some corroborating evidence of the sodomy crime. The vouching for the sodomy victim likely affected both convictions. In other cases, we have exercised discretion to correct the grave error in not striking true vouching testimony, notwithstanding the normal reluctance to address unpreserved error, because that type of evidence is particularly prejudicial to a defendant and inimical to a fair trial. We have declined to correct that type of error only in three circumstances, none of which is present here: where a defendant invites that error or has a plausible reason to allow that type of evidence to be introduced or when there is overwhelming evidence of a defendant's guilt. For those reasons, I respectfully dissent.

Duncan and Tookey, JJ., join in this dissent.